# EXPERT REPORT OF
# RONALD G. QUINTERO, CPA, CFA, ABV

## *IN RE:*

## *MITCHELL H. KOSSOFF*

## *v.*

## *RICKEY S. FELBERBAUM AND FLORIDA FORECLOSURE ATTORNEYS, PLLC*

———

## OCTOBER 2015

CHARTERED CAPITAL ADVISERS, INC.
NEW YORK, NEW YORK

## PREFACE

Chartered Capital Advisers, Inc. ("CCA") has been engaged by the attorneys representing the Mitchell Kossoff ("Mr. Kossoff" or the "Plaintiff") in *Mitchell H. Kossoff v. Rickey S. Felberbaum and Florida Foreclosure Attorneys, PLLC.*  The purpose of our activities has been to provide the Court information that should be considered in quantifying the unjust enrichment (the "Unjust Enrichment") of Rickey S. Felberbaum ("Mr. Felberbaum") and Florida Foreclosure Attorneys, PLLC ("FFA") in the aforementioned matter.  This report documents our opinions and supporting analyses.

CCA has relied upon documents produced by Mr. Felberbaum and FFA (collectively, the "Defendants"), documents from, and recollections of, Mr. Kossoff, litigation documents prepared in connection with this proceeding, as well as upon information from public sources generally regarded to be reliable (*Exhibit 1*).   CCA assumes no responsibility for the accuracy or completeness of the aforementioned.  We reserve the right to amend this report or provide addenda in the event that we obtain additional information, gain an enhanced understanding of information affecting our observations contained herein, or for other reasons.

Our report has been developed solely for the purpose of providing the Court with useful information and documenting the basis for our potential expert testimony in this matter.  It may not be used for any other purpose.  Possession of this document does not entitle the holders to rights of publication, other than in documents that may be filed and circulated in connection with this matter.

CCA and its affiliate, R. G. Quintero & Co. ("RGQ&Co."), provide financial advisory services, valuation services, financial restructuring services, forensic accounting services, and litigation-support services on behalf of a broad range of domestic and overseas clients of all sizes in a diversity of industries, including law firms and professional service firms (*Exhibit 28*).  The author of this report has more than thirty-five years' experience as a senior financial professional at KPMG, Bear Stearns, Zolfo Cooper, CCA, and RGQ&Co. (*Exhibit 29*).  He has served more than 750 clients, performed more than 1,000 valuations, and has testified as an expert witness on valuations and related matters on more than sixty occasions (*Exhibit 30*).  He has also been also been actively involved in the area of turnarounds, workouts, and bankruptcies, and has served as Treasurer and a member of the Executive Committee of the Turnaround

Management Association—the leading multidiscipline organization comprised of insolvency professionals. He is an award-winning scholar, lecturer, and writer (*Exhibit 31*).  He has an undergraduate and two graduate degrees in business, and has earned ten professional licenses, among which are Certified Public Accountant, Chartered Financial Analyst, AICPA-Accredited in Business Valuation, AICPA-Certified in Financial Forensics, Certified Fraud Examiner, Certified Turnaround Professional, and Certified Insolvency and Restructuring Advisor.  CCA and its employees do not have any present or contemplated interests in the outcome of this matter, nor are we aware of any client conflicts in this matter.  There are no factors that inhibited our firm from rendering a fair and unbiased analysis.

# TABLE OF CONTENTS

**Description**                                                                                    **Page**

Summary ............................................................................................................... 1
Background ........................................................................................................... 3
Defendants' Unjust Enrichment ........................................................................ 14
Certification ....................................................................................................... 20
Statement of Limiting Conditions ..................................................................... 21

                                                                                                **Exhibit**

Sources of Information ........................................................................................ 1
Florida Foreclosure Law Firms Featured by Google ......................................... 2
FFA Executive Team ........................................................................................... 3
FFA Attorneys ..................................................................................................... 4
FFA Financial Statements and Related Information:
    Summary of Cash-Basis Income Statements for the Five Years Ended December 31, 2014 .............. 5
    Analysis of Cash-Basis Income Statements for the Five Years Ended December 31, 2014 ................ 6
    Summary of "Accrual"-Basis Income Statements for the Five Years Ended December 31, 2014 ....... 7
    Analysis of "Accrual"-Basis Income Statements for the Five Years Ended December 31, 2014 ......... 8
    Cash-Basis Balance Sheet as of the Five Years Ended December 31, 2014 ............................ 9
    "Accrual"-Basis Balance Sheet as of the Four Years Ended December 31, 2013 ....................... 10
    Monthly Cash-Basis Revenues:  January 2013 – June 2015 ........................................... 11
    Summary of Taxable Income for the Three Years Ended December 31, 2011 ............................ 12
    Balance Sheet Summary as of the Three Years Ended December 31, 2011 ............................. 13
    QuickBooks Income Detail for the Five Years Ended December 31, 2014 ............................... 14
    Development of "Accrual" Income Statement for the Year Ended December 31, 2014 .................. 15
    Distributions:  January 2011 – June 2015 ............................................................ 16
Florida Leads the Nation in Foreclosures ........................................................ 17
Foreclosure Rate in the State of Florida ........................................................... 18
Number of Monthly Foreclosures in the State of Florida .................................. 19

# TABLE OF CONTENTS, continued

**Exhibit**

FFA Annual Revenues:  Cash and "Accrual" Basis ...................................................................... 20
FFA Annual Net Income:  Cash and "Accrual" Basis ................................................................. 21
FFA Annual Cash and "Accrual" Net Income and Distributions.................................................. 22
FFA Cumulative Cash and Accrual Net Income and Distributions............................................... 23
Segmentation of U.S. Law Firms by Staff Size ......................................................................... 24
FFA Annual Revenues:  Cash and "Accrual" Basis ...................................................................... 20
FFA Annual Net Income:  Cash and "Accrual" Basis ................................................................. 21
FFA Annual Cash and "Accrual" Net Income and Distributions.................................................. 22
FFA Cumulative Cash and Accrual Net Income and Distributions............................................... 23
Segmentation of U.S. Law Firms by Staff Size ......................................................................... 24
Calculation of the Defendants' Unjust Enrichment:
   Based on the Net Income Approach .................................................................................... 25
   Based on the Distributions Approach .................................................................................. 26
Verification of the Reasonableness of the Calculations of the Defendants' Unjust Enrichment
   Based on the Lodestar Method........................................................................................... 27
Description of Chartered Capital Advisers, Inc. ....................................................................... 28
Curriculum Vitae of Ronald G. Quintero, CPA, CFA, ABV ...................................................... 29
Expert Testimony of Ronald G. Quintero, CPA, CFA, ABV:  2011 - 2015 ................................ 30
Publishing Activities of Ronald G. Quintero, CPA, CFA, ABV.................................................. 31

## SUMMARY

➢ CCA has been retained to quantify the unjust enrichment of the Defendants in the above matter

➢ To perform our analyses, CCA has
  ♦ Reviewed various documents and information (*Exhibit 1*)
  ♦ Interviewed Mr. Kossoff
  ♦ Performed various analyses that are summarized herein

➢ Based on the foregoing, and the assumptions and information summarized in this document, it is our opinion that the **Defendants' Unjust Enrichment** as of **April 30, 2013** amounted to
  ♦ **$2,875,000** based on the **Income Approach** (*Exhibit 25*)
  ♦ **$4,250,000** based on the **Distributions Approach** (*Exhibit 26*)
  ♦ These opinions are expressed to a reasonable degree of professional certainty

➢ CCA verified the reasonableness of the above analyses based on the lodestar method, whereby a market-based hourly rate was applied to the estimated number of hours that the Plaintiff performed services for the Defendants without receiving current compensation
  ♦ The **lodestar method** quantifies the value of the services rendered by the Plaintiff to be at least **$2,244,564** (*Exhibit 27*)
  ♦ The lodestar method understates the value of the services rendered by the Plaintiff because
    • It assumes that that fees are paid currently on a noncontingent basis
    • It does not provide for success fees that are commonly added to lodestar fees in successful turnarounds
  ♦ Based on the successful results of the services rendered by the Plaintiff, we would expect the calculation of Unjust Enrichment to exceed the amount calculated based on the lodestar method

1

➢ The above analyses do not reflect additional amounts that the Court may award the Plaintiff for
  ♦ Statutory interest
  ♦ Reimbursement of professional fees
  ♦ Any other amounts that are within the Court's discretion

➢ Our analysis of unjust enrichment is based on the assumptions, and subject to the limiting conditions, described herein

## BACKGROUND

➢ **Overview**
- ♦ **FFA appears to be one of the largest residential real estate foreclosure law firms in the state of Florida**
  - • **FFA is among 3 foreclosure law firms highlighted by google in contrast to several dozen that are listed in the state of Florida (*Exhibit 2*)**
- ♦ **FFA, with offices in Boca Raton and Clearwater, serves the entire state of Florida, drawing on its staff of attorneys and paralegals, as well as a statewide network of attorneys and other service providers**
- ♦ **FFA's clients are principally comprised of loan service companies and institutional residential real estate lenders, including commercial banks, savings & loan associations, life insurance companies, and mutual savings banks**
  - • **These clients are high-volume, recurring sources of revenues**

➢ **Services**
- ♦ **FFA provides residential and commercial property foreclosures throughout the state of Florida**
- ♦ **The firm describes itself as "a 'cradle to grave' firm providing end-to-end service (foreclosure, bankruptcy, eviction, REO closing, and title) to its clients"[1]**
- ♦ **A distinguishing attribute of FFA is the 30 years of experience in the title insurance industry of one of its affiliated entities owned by Mr. Felderbaum that FFA markets as giving it an unsurpassed network of title insurance underwriters through each county in the state of Florida that enable the firm "to provide the absolute fastest turnaround of title work further enabling our team's ability to meet any timeline requirement and expectations of our clients" [2]**

---

[1] http://www.ffapllc.com/services/
[2] *Ibid.*

3

♦ Principal services
- Mortgage foreclosures
- Loss mitigation
- Bankruptcy
- Title curative
- Evictions
- Real estate closings
- REO closing division
- Title insurance
- Deficiency suits
- Suits on instruments
- Replevins/repossessions

➢ **Staff**
♦ The services provided by FFA are document intensive, and are performed primarily by paralegals, clerical employees and, to a lesser extent, junior attorneys
  - Because of the routine nature of the services, FFA has historically been able to draw on staffing agencies to provide trained personnel to perform many of the services done through FFA
♦ The executive team of FFA is comprised of (*Exhibit 3*)
  - Mr. Felberbaum, who balances his FFA activities with his legal practice, Felberbaum & Associates, PA ("F&A") and his title company Resource Title Co., Inc. ("RTC")
  - An attorney with about 5 years' experience, and
  - 2 administrative personnel
♦ Attorneys (*Exhibit 4*)
  - As of 9/15 the FFA Website listed 12 attorneys, excluding Mr. Felberbaum
  - They are generally attorneys with 2 to 5 years' experience as lawyers who graduated from less prominent law schools
    - With one exception, they generally lack the years of legal experience that would be required to be admitted to the partnership of a law firm resembling the size of FFA
♦ The nature of the types of services provided by FFA has enabled the firm to be built into a substantial practice relying heavily on paralegals, clerical staff, and independent contractors, with primarily junior attorneys, none of whom have become partners in FFA

➢ **Financial Data Proffered by the Defendants**
♦ Our analysis of the financial performance and condition of FFA was hampered because:

4

- We were denied electronic copies of financial information that was created and is readily available in electronic form
- We were denied information that would have been helpful for analyzing FFA and its financial information, such as the income tax returns for 2012 through 2014, and easily available information from the QuickBooks database that would have facilitated evaluating the financial information that was provided
- Financial information that was provided to us was not in chronological order, so we had to hunt around to find the information required to perform our analyses
- There were significant gaps in information provided, *e.g.*,
  - We were provided cash-basis income summaries for the six years ended 12/31/14, but only for the four years ended 12/31/13 on an "accrual" basis
  - We were provided monthly income statements for 2013 and 2014, no balances sheets other than for year-end (excluding the 12/31/14 accrual balance sheet)
- Financial statements for the same dates compiled in the same manner often conflicted, *e.g.*,
  - Cash-basis income statements for the year ended 12/31/14 (E*xhibit 14*)
  - Cash-basis balance sheets as of the year ended 12/31/14 (*Exhibit 9*)
  - Federal Income Tax returns for 2010 and 2011, represented as being cash based, as compared to QuickBooks financial information, both under cash and accrual accounting (*Exhibits 5*, *7*, *9*, and *10*)
- As a forensic accountant who has performed fraud investigations and projects on behalf of the U.S. Internal Revenue Services and the U.S. Department of Justice there is evidence that the financial information provided by the Defendant is likely to be erroneous, if not fraudulent, *e.g.*,
  - During the 4 years ended 12/31/14 FFA reported earning $6,395,294 on a cash basis (*Exhibit 5*), but only $2,560,290 on an "accrual" basis (*Exhibit 7*)
    - Since the only difference between cash and accrual accounting is the timing of recognition of certain revenues and expenses, differences between the first 3 years should have largely been realized by 2014, so that the only unrecognized difference should have been comprised of the difference between cash and accrual income during 2014—

5

approximately $900k (*Exhibits 5* and *7*)—rather than the $4MM difference that built up over the 4-year period

– A "red flag" that FFA had to have earned more than $2,560,290 reflected in the "accrual"-based income statements is that Mr. Felberbaum received distributions aggregating $6,467,017 (*Exhibit 16*) for the 4 years ended 12/31/14, which is slightly more than the cash-basis earnings of FFA during the same period, which amounted to $6,395,294 (*Exhibit 5*)

– Cash is cash, and it should not be significantly different under the cash vs. "accrual" accounting balance sheets (*Exhibits 9* and *10*)

– The "accruals" on the "accrual"-based balance sheets are unlikely to be accurate, as they appear to have insufficient receivables, unbilled revenues, payables, and accrued liabilities for a business of the scale of operations of FFA (*Exhibit 10* and underlying support documents)

– Since the FFA tax returns for 2010 and 2011 that Mr. Kossoff retained from the period during which he was serving FFA indicated that FFA was a cash-basis taxpayer, and those numbers are similar to the "accrual" based financial statements of FFA, my suspicion in that the "accrual"-based financial statements are simply an alternative set of financial statements that are created for purposes of minimizing taxable income

– It is unlikely that members equity would have been exactly $0 as of the year ended 12/31/13 (*Exhibit 10*)

– The decline in monthly revenues beginning in 11/14 that is reflected in the financial statements furnished by the Defendants
   · Is inconsistent with the sworn testimony of Mr. Felberbaum in which he testified that 2 years after he terminated Mr. Kossoff "we hit it big"[3]
   · Florida continues to lead the nation in foreclosures, which would favorably impact FFA as one of the leading foreclosure law firms in the state of Florida (*Exhibit 17*)

---

[3] Deposition of Rick S. Felberbaum on May 15, 2015, p. 406

CHARTERED CAPITAL ADVISERS, INC.

· The foreclosure rate in the state of Florida is almost triple the national average (*Exhibit 18*)
· There has been no falloff in the number of monthly foreclosures in the state of Florida during the past 12 months (*Exhibit 19*)
· The ostensible decline in monthly revenues coinciding with these legal proceedings in an environment in which business conditions favor FFA and Mr. Felberbaum has testified that FFA is doing well is not dissimilar to the "decline" that is often evident during a divorce when the spouse with the privately held business reports that the business has suddenly deteriorated so that historical earnings should not be considered in establishing alimony and child support

➢ **Financial Performance and Condition**
   ♦ Notwithstanding the aforementioned limitations, CCA has been able to make a number of observations about the financial performance and condition of FFA
   ♦ Financial performance
      • FFA's revenues, on a cash basis and "accrual" basis, skyrocketed during years 2011 – 2013 when Mr. Kossoff was working with FFA, and they have continued to grow since then (*Exhibit 20*)
      • On a cash basis, FFA graduated from being an unprofitable business in 2010, to a business with more than $500K in profits during 2011 and 2012, and reached "escape velocity" in 2013 when net income approached $2MM, only to be surpassed in 2014 when net income exceeded $3.3MM (*Exhibit 21*)
      • The "accrual"-basis income statement
         ▪ Reflected losses in 2011 and 2012, profits that were less than one tenth of cash basis profits in 2013, until 2014 when FFA's "accrual" accounting reached its limit in constraining profitability, and net income finally reached almost $2.5MM, but still significantly short of the cash-basis net income of $3.35MM (*Exhibit 22*)
         ▪ Fails to reflect the true profitability of FFA, as evidenced by the fact that (*Exhibit 23*)
            – During 2011 and 2012 FFA recorded losses, whereas it was able to make distributions of $242K and $1.94MM during the 2-year period

- – In 2013 FFA recorded $130K in earnings, but paid $1.42MM in distributions
- – In 2014 FFA recorded $2.46MM in earnings, but paid $3.1MM in distributions
- The trend and cumulative totals in cash-basis earnings beginning closely tracks distributions, whereas accrual earnings fall way short of distributions (*Exhibits 22* and *23*)
  - From 2011 through 2013 FFA had a cumulative total of
    - – $3.05MM in cash-basis net income
    - – $98K in "accrual"-basis net income
    - – $3.36MM in distributions
  - From 2011 through 2014 FFA had a cumulative total of
    - – $6.4MM in cash-basis net income
    - – $2.56MM in "accrual"-basis net income
    - – $6.46MM in distributions
- Over a multiple-year period net income should track distributions for a business such as FFA
  - Based on the obvious disparity between FFA's "accrual" accounting and its cash-flow-generating capability, CCA regards FFA's cash-basis financial statements to be more indicative of its economic performance than its "accrual"-basis financial statements
- CCA has not been provided sufficient information to evaluate FFA expenses that may not be valid costs of the business (*Exhibit 5*), *e.g.,*
  - Automobile expenses that have exceeded $100K/year since 2012
  - Annual travel expenses of $400K - $500K
  - Staff and independent contractor expenses
  - Payments to or on behalf of other entities owned by the Defendants
- ◆ Financial condition (*Exhibit 9*)
  - At the beginning of 2011 when Mr. Kossoff began to assist FFA the company had
    - A deficit cash balance of $78K
    - A balance of $130K on a line of credit
  - By the end of 2013
    - The cash balance grew to $381K

8

- ▪ Mr. Felberbaum was able to borrow from FFA (*i.e.*, withdraw tax-free) more than $700K in excess of the balance that he owed FFA at the beginning of 2011
- ▪ The balance drawn against the line of credit grew from $130K to over $500K
- • By the end of 2014
  - ▪ The cash balance further swelled to almost $650K
  - ▪ FFA was able to advance almost $900K to another entity (399 Holdings, LLC)
  - ▪ The balance drawn against the line of credit further increased to more than $800K

➢ **FFA Ownership**
- ♦ Mr. Felberbaum and an affiliated entity acquired certain assets of FFA from William M. Golson on 10/6/08 for $300,000[4]
  - • Acquired assets consisted of furniture, fixtures, office equipment, leasehold improvements, and intangible assets, such as client lists, files, and work in process
  - • Excluded assets included cash, accounts receivable, and prepaid expenses and client costs
  - • The only liabilities assumed were leases and obligation to complete client files on a timely basis
- ♦ The Forms K-1 of FFA for the year ended 12/31/11 indicated that Mr. Felberbaum owned 99% of the PLLC interests of FFA, and his law firm, Felberbaum and Associates, owned the other 1%

➢ **Affiliated Entities**
- ♦ FFA has 2 affiliates—F&A and RTC (collectively, the "Affiliates")
  - • The 2011 Federal Income Tax Return of the Affiliates indicated that they were 100% owned by Mr. Felberbaum, and they were listed at the same address in Boca Raton as FFA
- ♦ Felberbaum & Associates, P.A.
  - • Law firm that was incorporated on 10/6/00 with 2011 revenues of $2.3MM[5]
  - • Among the items that stand out on the 2011 federal income tax return are

---

[4] Asset Purchase Agreement between and among William M. Goldston and Associates, Attorneys at Law Chartered, and William M. Golson and Felberbaum Law Group LLC and Rick Felberbaum dated October 6, 2008, §3.1
[5] F&A 2011 U.S. Income Tax Return for an S Corporation, p. 1

- ▪ F&A did not report any compensation or distributions to Mr. Felberbaum
- ▪ Despite the revenue level and lack of reported compensation to Mr. Felberbaum, F&A reported a loss of $115,501[6]
- ▪ Although FFA and the Affiliates reported a combined loss and Mr. Felberbaum allegedly received no compensation or distributions from FFA and the Affiliates, he supposedly loaned $352,000 to F&A[7]
- ♦ Resource Title Co., Inc.
  - • Title company that was incorporated on 11/13/95 with 2011 revenues of $245,671[8]
  - • The 2011 federal income tax return indicated that RTC had taxable income of $11,013, and Mr. Felberbaum received no compensation or distributions from RTC[9]

➢ **Plaintiff's Involvement in FFA**[10]
  - ♦ Effective 1/1/11 Mr. Kossoff began to serve the Defendants pursuant to an oral agreement whereby he would provide services to the Defendants in exchange for receiving 22% of the equity of FFA (the "Consideration")
  - ♦ The services rendered by Mr. Kossoff on behalf of the Defendants included, but was not limited to
    - • Serving as Executive Vice President of FFA
    - • Performing various day-to-day services required to manage FFA
    - • Resolving a serious disciplinary complaint against Mr. Felberbaum in 5/11
    - • Resolving a number of litigations against the Defendants that were initiated by vendors, dissatisfied clients, general associates, and the owner of FFA's predecessor-in-interest (the Golson Law Firm)

---

[6] *Ibid.*
[7] *Op. cit.*, p. Schedule L
[8] RTC 2011 U.S. Income Tax Return for an S Corporation, p. 1
[9] *Op. cit.*, pp. 1 and 4
[10] Based on information contained in the Verified Complaint *in re:  Mitchell H. Kossoff v. Rickey S. Felderbaum and Florida Foreclosure Attorneys, PLLC* as well as conversations with Mr. Kossoff

- Restructuring, renewing, or otherwise resolving various personal loans, business loans, and maturing lines of credit that placed the Defendants at risk of litigation and/or creditor litigation
- Negotiating and obtaining lines of credit required for FFA to operate and grow
- Instituting management practices that ensured that FFA would be run in a more professional manner
- Sales and marketing
- Developing and implementing a growth plan
- Interfacing with FFA staff, vendors, lenders, creditors, clients, and prospective clients
- Putting an end to the FFA practice of comingling funds of FFA, related entities, and client trust accounts as a consequence of FFA's ongoing cash crisis that preceded Mr. Kossoff's retention by FFA
- Facilitating cooperation and coordination of FFA activities in Boca Raton and Tampa by securing and negotiating new leases, lease amendments, and/or lease terminations to organize FFA for improved communication, productivity, stability, and economic growth
- Recruiting and training a management team
- Obtaining proper malpractice insurance with verifiable application information so that future claims would not be denied by FFA's insurance carriers
- Implementing a system requiring all FFA attorneys to prepare and submit to Mr. Kossoff daily time records

♦ With the above items having been implemented, and FFA being on a stable financial and operational foundation with an upward trajectory in revenues and profits, in 4/13 the Defendants unilaterally terminated Mr. Kossoff's position and denied that there was ever an agreement to pay the Consideration

➤ **FFA Business Attributes**
   ♦ Distinguishing attributes of FFA as a commercial entity include, but are not limited to the following

- During Mr. Kossoff's association with FFA it became a medium-size law firm and leader in its niche without have to admit any partners
  - 96.7% of U.S. law firms have less than 20 employees[11]
  - The peer group of FFA, with 20 – 99 employees, is exceeded by only 1.2% of law firms in the U.S. (*Exhibit 24*)
- With distributions to Mr. Felberbaum in excess of $1.7MM, $1.4MM, and $3.1MM during 2012, 2013, and 2014, respectively (in addition to the $700K shareholder loan during 2013), by 2014 Mr. Felberbaum was able to enjoy a level of profitability that was approximately twice that of the $1.55MM average profits per partner of the AM Law 100 law firms, which are the largest and richest law firms in the U.S.[12]
- FFA enjoys recurring business from large, creditworthy financial institutions
  - A large portion of revenues constitute repeat business from historical clients
  - FFA's historical service to its existing clients facilitates obtaining business from other lending institutions
  - Writeoffs are less common than in other areas of the legal profession
- Mortgage foreclosures are countercyclical, and are favorably impacted by economic downturns
- FFA's work is highly leverageable
  - Mr. Felberbaum has not had to admit any partners
  - The work is repetitive in nature, and can be done by low-cost, junior attorneys, paralegals, and administrative personnel
    - Attorneys with advanced skills who would normally insist on being partners are not required
  - Employees are easily replaceable, and abundantly available
  - Staffing agencies can provide personnel with requisite skills to meet peak levels of activity
- FFA has ample access to funding to support current levels of activity and growth

---

[11] Stephen Morea, "Law Firms in the U.S.," (*IBISWorld Industry Report 54111*, April 2015), p. 19
[12] David Lat, "The 2015 Am Law 100: Revenues Rising, Profits Popping, And A New #1 Firm," www.abovethelaw.com, April 27, 2015

CHARTERED CAPITAL ADVISERS, INC.

- Even after Mr. Kossoff's termination, Mr. Felberbaum has been able to enjoy large and growing levels of profitability without devoting his full attention to FFA, while still operating the Affiliated Entities

➢ **CCA Assignment**

♦ FFA did not issue Mr. Kossoff's the 22% equity stake in FFA that he had agreed to accept from the Defendants in lieu of current compensation, nor did FFA pay Mr. Kossoff 22% of FFA profits as Mr. Felberbaum had promised as an alternative to issuing Mr. Kossoff equity when it became clear that Mr. Kossoff could not hold the equity interest because he was not admitted to the Florida bar

♦ In his opinion issued in this case as of 5/7/14, Hon. Robert W. Sweet indicated that "Plaintiff has adequately established the existence of an unjust enrichment claim"[13]

♦ CCA has been asked by the attorneys representing Mr. Kossoff to quantify the Unjust Enrichment

---

[13] Opinion of Hon. Robert W. Sweet *in re: Mitchell H. Kossoff v. Rickey S. Felderbaum and Florida Foreclosure Attorneys, PLLC*, dated May 7, 2014, p. 10

CHARTERED CAPITAL ADVISERS, INC.

## DEFENDANTS' UNJUST ENRICHMENT

➢ **Valuation Approaches**
- ◆ CCA has used two approaches to quantify the Defendants' unjust enrichment as of the Valuation Date
  - • The Income Approach
  - • The Distributions Approach
- ◆ CCA verified the reasonableness of our analyses based on the lodestar method whereby we applied a market-based hourly billing rate for services rendered by the Plaintiff on behalf of the Defendants to the estimated number of hours worked on FFA by the Plaintiff

➢ **Income Approach** (*Exhibit 25*)
- ◆ Components of Unjust Enrichment
  - 22% of net income from 1/1/11 through 4/30/13
  - + 22% of the terminal value of enhanced income as of 4/30/13
  - = Unjust enrichment of the Defendants
- ◆ 22% represents the percent of FFA equity that the Plaintiff asserts that he had agreed to accept as Consideration
- ◆ Net income
  - • CCA used the cash-basis income statements for the 2 years ended 12/31/12 (*Exhibit 5*) and the 4 months ended 4/30/13 (when the Defendants unilaterally terminated the employment of the Plaintiff)
    - ▪ As stated in the previous section of our report, the accrual-based income statements are not reliable
    - ▪ CCA did not make any adjustments to the income statements as provided to us by the Defendants for expenses that were of a personal nature or other unusual items

14

- – Our ability to make such adjustments was impeded because the Defendants did not provide us the detailed information that was readily available from their QuickBooks database to perform such an analysis
- ◆ Terminal value
  - The Unjust Enrichment of the Defendants as a consequence of the services rendered by the Plaintiff is not limited to earnings during the period in which the Plaintiff served as Executive Vice President of FFA, but is most significantly comprised of the enhanced earnings generating capability of FFA as a result of activities, actions, and processes initiated by the Plaintiff
    - Prior to the employment of the Plaintiff, FFA was a money-losing business (*Exhibit 5*) with a negative cash balance (*Exhibit 9*)
    - The revenues of FFA grew fivefold during the years that the Plaintiff worked for the Defendants, with net income reaching $1.94MM in the year that the Plaintiff's employment was unilaterally terminated by the Defendants, and surpassing $3.3MM on a similar revenue base the following year (*Exhibit 5*)
    - Terminal value reflects the enhanced earnings generating capability of FFA that would continue to inure to the Plaintiffs after the termination of the Plaintiff
  - The enhanced earnings generating capability of FFA was calculated by capitalizing FFA's 2013 net income at a capitalization rate of 18.57%[14]
    - If CCA annualized the net income of FFA during the 4 months ended April 2013[15] rather than using the annual total our estimate of terminal value would be higher
  - Our capitalization rate of 18.57% was developed based on the Build-Up Method
    - The Build-Up Method is one of the most widely used methods applied by valuators to estimate the cost of equity or discount rate for privately held businesses
    - Under the Build-Up Method, the discount rate is developed by adding to the risk-free rate various market-based adjustments applicable to the required rate of return of equity investments, industry considerations, small-size adjustment, and lack of marketability

---

[14] Capitalization rate of 18.57% = multiple of 5.38 (1 ÷ 18.57%)
[15] $1,551,708 per *Exhibit 25*

CHARTERED CAPITAL ADVISERS, INC.

- By not reducing the discount rate by a long-term growth rate, as is required in applying the Gordon Growth Model,[16] our analysis does not give the Plaintiff any credit for the FFA growth potential based on systems, procedures, and personnel that he put in place
  - If we had deducted an assumed long term growth rate from the discount rate in developing the capitalization rate, our estimate of terminal value and Unjust Enrichment would have been increased
  - In fact, earnings continued to grow significantly in 2014, even though revenues did not, increasing from $1.94MM in 2013 to $3.35MM in 2014 (*Exhibit 5*)
- ♦ Unjust Enrichment based on the Income Approach (*Exhibit 25*)
  - Based on the calculations and assumptions described above, it is our opinion that the Unjust Enrichment of the Defendants was **$2,875,000** as of **April 30, 2013** based on the **Income Approach**

- ➢ **Distributions Approach** (*Exhibit 26*)
  - ♦ Components of Unjust Enrichment
    - 22% of distributions during 2011 and 2012
    - + 22% of 2013 distributions, prorated to reflect the 4 months ended 4/30/13
    - + 22% of the terminal value of enhanced distributions capability of FFA as of 4/30/13
    - = Unjust enrichment of the Defendants
  - ♦ Distributions vs. net income
    - Over time, the distributions of a business similar to FFA should be similar to net income
      - Discrepancies between the two call into question the reliability of net income reported, about which CCA has expressed skepticism in the previous section
      - On a cumulative basis, beginning 2011, the cash-basis net income as a percent of distributions was (*Exhibit 23*)
        - 57.0% of distributions through 12/31/12

---

[16] "The Gordon Growth Model is the best known of a class of discounted dividend models and is a variation of the discounted cash flow valuation model, www.stockresearchpro.com

16

  – 90.6% of distributions through 12/31/13
  – 98.9% of distributions through 12/31/14
- Accordingly, distributions provide a reliable indication of the true "earnings" of FFA over time, unaffected by any deficiencies in accounting calculations, errors, or potential manipulations

♦ Distributions during 2011 and 2012
- CCA used the amounts reflected in the FFA financial statements (*Exhibit 16*)

♦ Distributions for the 4 months ended April 30, 2013
- Although the amount of distributions is most heavily influence by the level of income, the timing of the payment of distributions was subject to the discretion and needs of Mr. Felberbaum
- Accordingly, CCA believes that an objective basis for providing for distributions applicable to earnings during the 4 months ended April 30, 2013 is to prorate earnings evenly throughout all 12 months of 2013, therefore CCA multiplied 2013 distributions by 4/12
- If CCA had used earnings for the 4 months ended 4/30/13 as a percent of 2013 earnings, and applied that multiple to 2013 distributions, our provision for distributions during the first 4 months of 2013, and hence, Unjust Enrichment, would have been higher

♦ Terminal value
- As previously described, the terminal value of distributions is the enhanced value of distribution capability that inured to the Defendants after the Plaintiff was terminated that can be attributed to his services
- This distribution capability is comprised not only of 2013 distributions, but also other discretionary uses of cash flow during 2013 that, but for decisions of the Defendants, could have also resulted in distributions, specifically (*Exhibit 26*)
  - Increase in cash and cash equivalents by $349K
  - A loan by FFA of $908K to Mr. Felberbaum (essentially, a tax-free distribution)
  - The net repayment of the line of credit and notes payable in the amount of $469K
  - The sum of 2013 distributions and the above adjustments, amounting to $3.147MM seems reasonable, as the following year FFA had distributions of $3.1MM in distributions

(*Exhibit 16*) on a revenue level comparable to 2013 (*Exhibit 5*), in addition to increasing its cash balance by more than $250K and advancing $896K to 399 Holdings, LLC (*Exhibit 9*)

- CCA capitalized the 2013 FFA distribution capability by the previously described capitalization rate of 18.57% to calculate the terminal value of Unjust Enrichment

♦ Unjust Enrichment based on the Distributions Approach (*Exhibit 26*)

- Based on the calculations and assumptions described above, it is our opinion that the Unjust Enrichment of the Defendants was **$4,250,000** as of **April 30, 2013** based on the **Distributions Approach**

➢ **Lodestar Method** (*Exhibit 27*)

♦ CCA verified the reasonableness of the above analyses based on the lodestar method, whereby a market-based hourly rate was applied to the estimated number of hours that the Plaintiff performed services for the Defendants without receiving current compensation

♦ Estimated hours

- Mr. Kossoff recorded only a small fraction of his time for services rendered on behalf of the Defendants because he was to be compensated based on the success of FFA as an equity holder
  - Accordingly, there are there are limited time records for the time that he spent on behalf of the Plaintiffs
- Mr. Kossoff works a 60-hour week, and estimates that he devoted half of his time to FFA during 2011 and 2012, and a reduced amount of time prior to his termination in April 2013
- For purposes of this analysis, CCA has made a provision of
  - 30 hours per week over 50 weeks during 2011 and 2012
  - 15 hours per week over 16 weeks during 2013

♦ Hourly rate

- CCA developed an hourly rate of $692.77 that was charged by turnaround firms in Florida bankruptcies between 2008 and 2014
- The above hourly rates pertain to services rendered by turnaround and restructuring firms that were performing services similar to those performed by Mr. Kossoff on behalf of FFA

- ▪ Such fees must be approved by the bankruptcy court, and are subject to challenge by the U.S. Trustee, the debtor, creditors, and other parties in interest
- ▪ They must be the same as fees charged by such firms for similar projects for nonbankrupt clients
- CCA identified the cases by doing an Internet search for fee applications by restructuring firms known to CCA that were working on cases in the state of Florida
- The hourly rates were for professionals at the Managing Director or Senior Managing Director level, who generally have fewer years of profession experience than Mr. Kossoff
- CCA used the median hourly rate charged in the four cases identified
- The median hourly rate of $692.77 is reasonable, if not low, based on our experience and judgment
- ♦ The **lodestar method** quantifies the value of the services rendered by the Plaintiff to be at least **$2,244,564** (*Exhibit 27*)
  - The lodestar method understates the value of the services rendered by the Plaintiff because
    - ▪ It assumes that that fees are paid currently on a noncontingent basis
    - ▪ It does not provide for success fees that are commonly added to lodestar fees in successful turnarounds
- ♦ Based on the successful results of the services rendered by the Plaintiff, we would expect the calculation of Unjust Enrichment to exceed the amount calculated based on the lodestar method

## CERTIFICATION

We hereby certify the following statements regarding this valuation analysis:

➢ We have no present or prospective future interest in the assets, properties, or business interests that are the subject of this document.

➢ We have no personal interest or bias with respect to the subject matter of this document or the parties involved.

➢ Our compensation for preparing this document is in no way contingent upon the outcome of this matter or on any predetermined value.

➢ To the best of our knowledge and belief, the statements of facts contained in this document, on which the analyses, conclusions, and opinions expressed herein are based, are true and correct.

CHARTERED CAPITAL ADVISERS, INC.

Ronald G. Quintero, CPA, CFA, ABV, CFF, CTP, CIRA
Managing Director

20

## STATEMENT OF CONTINGENT AND LIMITING CONDITIONS

This report has been prepared subject to the following general contingent and limiting conditions:

➢ We assume no responsibility for the legal description of matters including legal or title considerations. Title to the subject assets, properties, or business interests is assumed to be good and marketable unless otherwise stated.

➢ We assume responsible ownership and competent management and custodial practices with respect to the subject assets, properties, and business interests during the times referenced in our report.

➢ The information furnished to us by others and obtained by us from public sources is believed to be accurate.  However, we issue no warranty or other form of assurance regarding its accuracy.

➢ We assume no hidden or undisclosed conditions regarding the subject assets, properties, or business interests.

➢ We assume that there was full compliance with all applicable federal, state, and local regulations and laws.

➢ We assume that all required licenses, certificates of occupancy, consents, or legislative or administrative authority from any local, state, or national government, or private entity or organization have been or could have been obtained or reviewed for any use on which this document is based.

➢ This document has been prepared for the exclusive use of the Court and the lawyers retained by the Plaintiff.  Only such parties may rely upon this document.

21

CHARTERED CAPITAL ADVISERS, INC.

➢ *CCA is not explicitly or implicitly guaranteeing the outcome of the matter for which we have been retained.* A condition of receipt of this document is that the aggregate financial responsibility of CCA to any and all parties collectively who may assert to have relied upon this the amount of fees paid to CCA in this matter. Moreover, any third party purporting to rely on this document agrees that, in the event it were to be unsuccessful in a lawsuit against CCA, it would be responsible for reimbursing CCA for any and all reasonable attorneys and expert fees and related expenses.

➢ Possession of this document does not carry with it the right of publication. It may not be used for any purpose by any person other than the client to whom it is addressed without our written consent, and in any event, only with proper written qualifications and only in its entirety.

➢ By reason of this document, we are not required to furnish a report in any other format, or to give testimony or to be in attendance in court or any other venue with respect to the assets, properties, or business interests in question unless arrangements have been previously made.

➢ Neither all nor any part of the contents of this document shall be disseminated to the public through advertising, public relations, news, sales, or other media without our prior written consent and approval.

➢ The analyses, opinions, and conclusions presented in this document apply to this engagement only and may not be used out of the context presented herein. This document is valid only for the effective dates specified herein, and only for the purpose specified herein.

22

# EXHIBIT 1
# SOURCES OF INFORMATION

**People**
- Mitchell H. Kossoff

**Nonpublic Documents**
- Asset Purchase Agreement between and among William M. Goldston and Associates, Attorneys at Law Chartered, and William M. Golson and Felberbaum Law Group LLC and Rick Felberbaum dated October 6, 2008
- Deposition of Rick Felberbaum dated May 15, 2015
- FFA:
  – "Accrual"-basis income statements for the 4 years ended 12/31/13
  – "Accrual"-basis income statement for the 9 months ended 9/30/14
  – "Accrual"-basis income statements:  January 2013 – June 2015
  – "Accrual"-basis balance sheets for the 4 years ended 12/31/13
  – Cash-basis income statements for the 6 years ended 12/31/14
  – Cash-basis income statements:  January 2013 – June 2015
  – Cash-basis balance sheets for the 6 years ended 12/31/14
  – Income tax returns and supporting schedules for the three years ended 12/31/10
- Felberbaum & Associates, P.A.—income tax returns and supporting schedules for the 3 years ended 12/31/11
- Felberbaum & Associates, P.A.—income tax returns and supporting schedules for the 3 years ended 12/31/11
- Resource Title Co., Inc.—income tax returns and supporting schedules of the 3 years ended 12/31/11
- Timeslips records of Mitchell H. Kossoff

**Litigation Documents**
- *Mitchell Kossoff v. Rickey S. Felberbaum and Florida Foreclosure Attorneys, PLLC:*
  – Verified Complaint dated January 27, 2014 and exhibits thereto
  – Defendants' Answer and Counterclaim dated May 21, 2014 and exhibits thereto
  – Plaintiff's Answer to Counterclaim dated June 17, 2014
  – Opinion of Hon. Robert W. Sweet dated May 7, 2014

**Public Information**
- *Business Reference Guide*
- Cambridge Private Equity Index
- Federal Bankruptcy Court
- First Research Industry Profiles
- *Ibbotson SBBI 2013 Valuation Yearbook*
- IBIS*World*
- David Lat, "The 2015 Am Law 100: Revenues Rising, Profits Popping, And A New #1 Firm," www.abovethelaw.com, April 27, 2015
- *The Wall Street Journal*
- www.bankrate.com
- www.ffapllc.com
- www.google.com
- www.realtytrac.com
- www.stockresearchpro.com

**EXHIBIT 2**
**FLORIDA FORECLOSURE LAW FIRMS FEATURED BY GOOGLE**



Source:  www.google.com

## EXHIBIT 3
## FFA EXECUTIVE TEAM



**RICK FELBERBAUM, ESQ., President/Managing Attorney.**  Rick Felberbaum is an attorney dually licensed to practice law in both New York and Florida. Mr. Felberbaum received his Bachelor's degree from Boston University and his Juris Doctor from Fordham University School of Law in New York. Mr. Felberbaum has had extensive experience in the field of real estate transactions, as well as foreclosures. Mr. Felberbaum started his career by co-founding a boutique real estate law firm in Manhattan where through that entity he serviced the needs of a variety of banking institutions. Thereafter in Florida he founded a law firm as well as a title company which focuses on residential real estate closings and which services several national title insurance underwriters as well as prominent relocation companies and developers.

Rick Felberbaum is also the founder of Florida Foreclosure Attorneys (FFA), which is one of only two law firms in the entire state of Florida with a USFN membership. FFA has offices in both Clearwater and Boca Raton in order to effectively service east and west coast courts and jurisdictions.  Rick Felberbaum, as President and Managing Attorney of FFA leads a highly skilled, aggressive and experienced team of attorneys and paralegals who together have achieved an LPS ranking well above the state average. According to LPS FFA's average compliance rate is 98% and is at the top of the highest tier of all firms in Florida.



**JENNIFER WERSAL, Chief Compliance Officer.**
Prior to joining Florida Foreclosure Attorneys, Ms. Wersal had many years of experience in the mortgage foreclosure industry. Ms. Wersal is responsible for ensuring continual adherence to all our clients' needs and directives. She is a graduate of Metropolitan State University in St. Paul, MN where she received a B.A. in Individualized Studies. After leaving college Ms. Wersal served as a supervisor at Lender Processing Solutions (LPS), where she managed the "title curative and contested operations" group that supported the foreclosure attorney network. Immediately prior to joining FFA, Ms. Wersal was a compliance supervisor for Prommis Solutions, where she was responsible for managing vendor systems, and client compliance.

Source:  http://www.ffapllc.com/executive-team/

**EXHIBIT 3, continued**
**FFA EXECUTIVE TEAM**



**MELODY MAXWELL, Director of Operations.**  Melody Maxwell serves as Operations Manager and Director of Human Resources. Ms. Maxwell began her career as a licensed real estate agent for Berger Realty in Coral Springs, Florida. She later graduated with a degree in legal studies and started as a lead eviction paralegal for the Florida office of a multi-state foreclosure law firm. Ms. Maxwell was hired by Florida Foreclosure Attorneys initially to lead one of FFA's foreclosure practice divisions. Soon after and based upon Ms. Maxwell's unusual insight and ability to deal with all aspects of the foreclosure process, in tandem with her leadership skills, she was elevated to her present position as Operations Manager and Director of Human Resources for the firm.



**WILLIAM C. SLABAUGH, ESQ., Managing Attorney of Operations.**  William C. Slabaugh, Esq. graduated from the University of Florida with a B.S. in Finance in 2006. Mr. Slabaugh graduated Florida A&M University, College of Law in 2010 and was admitted to The Florida Bar that same year.  He began his career in the area of criminal law with The Baez Law of Kissimmee, Florida as trial counsel in numerous major felony and misdemeanor cases throughout Central Florida. He later moved to South Florida and joined Florida Foreclosure Attorneys in the Boca Raton office in 2012.

Source:  http://www.ffapllc.com/executive-team/

**EXHIBIT 4**
**FFA ATTORNEYS**

| Attorney | Law School—Year of Graduation | Admitted to FL Bar | Joined FFA | Biography |
|---|---|---|---|---|
| Alan Kingsley | University of Virginia School of Law—2007 | 2007 | 2013 | http://www.ffapllc.com/bios/alan-kingsley-esq/ |
| David Claros | Florida A&M College of Law—2010 | 2011 | ? | http://www.ffapllc.com/bios/david-claros-esq/ |
| David Dilts | Western New England Univ. School of Law—2000 | 2009 | 2014 | http://www.ffapllc.com/bios/david-dilts-esq/ |
| Erik Silevitch | Nova Southeastern School of Law—2011 | 2011 | 2011 | http://www.ffapllc.com/bios/erik-silevitch-esq/ |
| Joe Paxton | Nova Southeastern School of Law—2011 | 2012 | 2012 | http://www.ffapllc.com/bios/joe-paxton-esq/ |
| Karla Fajado | University of Toledo College of Law—2011 | ? | 2012 | http://www.ffapllc.com/bios/karla-fajardo-esq/ |
| Mark Morales | Nova Southeastern School of Law—2008 | 2009 | 2013 | http://www.ffapllc.com/bios/mark-morales-esq/ |
| Roger Bear | Florida College of Law—1980 | 1980 | 2007 | http://www.ffapllc.com/bios/roger-bear-esq/ |
| Tricia Morra | St. Thomas University School of Law—2011 | ? | 2012 | http://www.ffapllc.com/bios/tricia-morra-esq/ |
| Vanessa Solano | Nova Southeastern School of Law—2012 | 2013 | 2013 | http://www.ffapllc.com/bios/vanessa-solano-esq/ |
| William Noriega | Stetson University College of Law—2010 | ? | 2013 | http://www.ffapllc.com/bios/william-noriega-esq/ |
| William Slabaugh | Florida A&M College of Law—2010 | 2010 | 2013 | http://www.ffapllc.com/bios/william-c-slabaugh-esq/ |

Sources:  www.ffapllc.com; www.LinkedIn.com

| EXHIBIT 5 | | | | |
| FLORIDA FORECLOSURE ATTORNEYS, PLLC | | | | |
| SUMMARY OF CASH-BASIS INCOME STATEMENTS | | | | |
| FOR THE FIVE YEARS ENDED DECEMBER 31, 2014[1] | | | | |
| | **2010** | **2011** | **2012** | **2013** | **2014** |
|---|---|---|---|---|---|
| Revenues | $3,504,818 | 6,043,234 | 11,950,375 | 17,799,581 | 18,117,984 |
| | | | | | |
| Expenses: | | | | | |
| Staff & independent contractors[2] | (1,674,018) | (3,667,769) | (7,189,847) | (10,298,779) | (9,256,326) |
| REO expenses | 0 | 0 | (49,948) | (538,575) | (780,051) |
| 7036 online fees—client systems | (70,046) | (406,316) | (620,311) | (365,160) | (220,174) |
| Operating expenses | (320,247) | (781,427) | (1,602,031) | (3,084,982) | (2,075,772) |
| Insurance | (167,273) | (319,064) | (363,919) | (605,300) | (732,809) |
| Computer expenses | (67,937) | (154,775) | (383,540) | (571,690) | (605,867) |
| Travel expenses | (275,151) | (514,482) | (498,950) | (432,032) | (401,188) |
| Auto expenses | (7,683) | (30,109) | (102,134) | (163,493) | (152,490) |
| Other | (135,368) | (137,515) | (632,612) | (1,005,556) | (1,185,030) |
| | (2,717,723) | (6,011,457) | (11,443,292) | (17,065,567) | (15,409,707) |
| | | | | | |
| Other income, net | (802,542) | 567,994 | 0 | 1,206,609 | 639,540 |
| | | | | | |
| Net income | ($15,447) | 599,771 | 507,083 | 1,940,623 | 3,347,817 |

[1]Based on QuickBooks data compiled by FFA; see *Exhibit 14*

| [2]Attorney attendee costs | $152,529 | 216,723 | 295,515 | | |
|---|---|---|---|---|---|
| Employee leasing expense | | | | | |
| Casual labor—attorney, legal | 43,403 | 2,172 | | | |
| Outside services | 6,424 | | 650,068 | 1,204,976 | 772,135 |
| Payroll expenses | 1,471,662 | 72,415 | 6,244,264 | 9,093,803 | 8,484,191 |
| Payroll processing fees | | 3,376,459 | | | |
| | $1,674,018 | 3,667,769 | 7,189,847 | 10,298,779 | 9,256,326 |

| EXHIBIT 6 FLORIDA FORECLOSURE ATTORNEYS, PLLC ANALYSIS OF CASH-BASIS INCOME STATEMENTS FOR THE FIVE YEARS ENDED DECEMBER 31, 2014 | | | | | |
|---|---|---|---|---|---|
| | **2010** | **2011** | **2012** | **2013** | **2014** |
| Revenues | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| | | | | | |
| Expenses: | | | | | |
| Staff & independent contractors | -47.8% | -60.7% | -60.2% | -57.9% | -51.1% |
| REO expenses | 0.0% | 0.0% | -0.4% | -3.0% | -4.3% |
| 7036 online fees—client systems | -2.0% | -6.7% | -5.2% | -2.1% | -1.2% |
| Operating expenses | -9.1% | -12.9% | -13.4% | -17.3% | -11.5% |
| Insurance | -4.8% | -5.3% | -3.0% | -3.4% | -4.0% |
| Computer expenses | -1.9% | -2.6% | -3.2% | -3.2% | -3.3% |
| Travel expenses | -7.9% | -8.5% | -4.2% | -2.4% | -2.2% |
| Auto expenses | -0.2% | -0.5% | -0.9% | -0.9% | -0.8% |
| Other | -3.9% | -2.3% | -5.3% | -5.6% | -6.5% |
| | -77.5% | -99.5% | -95.8% | -95.9% | -85.1% |
| | | | | | |
| Other income, net | -22.9% | 9.4% | 0.0% | 6.8% | 3.5% |
| | | | | | |
| Net income | -0.4% | 9.9% | 4.2% | 10.9% | 18.5% |

Based on Exhibit 5

**EXHIBIT 7**
**FLORIDA FORECLOSURE ATTORNEYS, PLLC**
**SUMMARY OF "ACCRUAL"-BASIS INCOME STATEMENTS**
**FOR THE FIVE YEARS ENDED DECEMBER 31, 2014[1]**

| | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|
| Revenues | $2,753,187 | 6,042,372 | 11,918,706 | 16,950,477 | 17,630,748 |
| Expenses: | | | | | |
| Staff & independent contractors[2] | (297,118) | (3,609,728) | (866,674) | (9,083,268) | (9,272,073) |
| REO expenses | 0 | 0 | (49,948) | (545,451) | (767,089) |
| 7036 online fees—client systems | (70,046) | (406,316) | (620,311) | (385,160) | (227,594) |
| Operating expenses | 0 | 0 | 0 | 0 | (2,177,741) |
| Insurance | (159,369) | (320,116) | (363,919) | (605,300) | (651,024) |
| Computer expenses | (3,435) | (89,088) | (350,510) | (571,690) | (643,582) |
| Travel expenses | (276,151) | (514,462) | (645,800) | (432,032) | (400,449) |
| Professional fees[3] | (47,155) | (64,915) | (599,469) | (1,090,753) | 0 |
| Vehicle expenses | (7,683) | (30,109) | (11,229) | (81,747) | (170,997) |
| Other | (1,886,571) | (1,004,705) | (8,392,353) | (2,707,870) | (1,402,783) |
| | (2,747,528) | (6,039,439) | (11,900,213) | (15,503,271) | (15,713,332) |
| Other income, net | 0 | (6,108) | (46,814) | (817,555) | 544,719 |
| Bad debt expense | 0 | 0 | 0 | (500,000) | 0 |
| Net income | $5,659 | (3,175) | (28,321) | 129,651 | 2,462,135 |

[1]Based on QuickBooks data compiled by FFA; see *Exhibits 14* and *15*

| [2]Attorney attendee costs | $153,164 | 236,880 | 295,515 | 0 | 25,940 |
|---|---|---|---|---|---|
| Employee leasing expense | 0 | 3,370,676 | 0 | 0 | 0 |
| Casual labor—attorney, legal | 43,403 | 2,172 | 0 | 0 | 0 |
| Outside services | 0 | 0 | 0 | 0 | 759,908 |
| Payroll expenses | 0 | 0 | 0 | 8,300,284 | 8,486,225 |
| Payroll processing fees | 12,753 | 0 | 68,791 | 78,035 | 0 |
| Payroll taxes | 87,798 | 0 | 502,368 | 704,949 | 0 |
| | $297,118 | 3,609,728 | 866,674 | 9,083,268 | 9,272,073 |

| EXHIBIT 8 FLORIDA FORECLOSURE ATTORNEYS, PLLC ANALYSIS OF "ACCRUAL"-BASIS INCOME STATEMENTS FOR THE FIVE YEARS ENDED DECEMBER 31, 2014 | | | | | |
|---|---|---|---|---|---|
| | **2010** | **2011** | **2012** | **2013** | **2014** |
| Revenues | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| Expenses: | | | | | |
| Staff & independent contractors[2] | -10.8% | -59.7% | -7.3% | -53.6% | -52.6% |
| REO expenses | 0.0% | 0.0% | -0.4% | -3.2% | -4.4% |
| 7036 online fees—client systems | -2.5% | -6.7% | -5.2% | -2.3% | -1.3% |
| Operating expenses | 0.0% | 0.0% | 0.0% | 0.0% | -12.4% |
| Insurance | -5.8% | -5.3% | -3.1% | -3.6% | -3.7% |
| Computer expenses | -0.1% | -1.5% | -2.9% | -3.4% | -3.7% |
| Travel expenses | -10.0% | -8.5% | -5.4% | -2.5% | -2.3% |
| Professional fees[3] | -1.7% | -1.1% | -5.0% | -6.4% | 0.0% |
| Vehicle expenses | -0.3% | -0.5% | -0.1% | -0.5% | -1.0% |
| Other | -68.5% | -16.6% | -70.4% | -16.0% | -8.0% |
| | -99.8% | -100.0% | -99.8% | -91.5% | -89.1% |
| Other income, net | 0.0% | -0.1% | -0.4% | -4.8% | 3.1% |
| Bad debt expense | 0.0% | 0.0% | 0.0% | -2.9% | 0.0% |
| Net income | 0.2% | -0.1% | -0.2% | 0.8% | 14.0% |

Based on Exhibit 7

| **EXHIBIT 9** |||||||
| **FLORIDA FORECLOSURE ATTORNEYS, PLLC** |||||||
| **CASH-BASIS BALANCE SHEET** |||||||
| **AS OF THE FIVE YEARS ENDED DECEMBER 31, 2014** |||||||
| | Dec-10[1] | Dec-11[2] | Dec-12[3] | Dec-13[4] | Dec-14[5] | Dec-14[6] |
|---|---|---|---|---|---|---|
| *Assets* | | | | | | |
| Current assets: | | | | | | |
|   Cash and cash equivalents | ($77,592) | 182,885 | 32,378 | 381,499 | 644,330 | 645,939 |
|   Client trust accounts | 176,153 | 101,496 | 141,710 | 11,169 | 202,135 | 202,135 |
|   Escrow accounts | 7,000 | 3,970 | 17,910 | 35,617 | 44,589 | 44,589 |
|   Due from 399 Holdings, LLC | 0 | 0 | 0 | 0 | 896,294 | 896,294 |
|   Shareholder loan | 192,000 | 0 | 0 | 907,874 | 907,874 | 907,874 |
|   Other current assets | 5,248 | 436,486 | (47,886) | 3,025 | 10,403 | 10,413 |
|   Balancing adjustment | 0 | 0 | 0 | 0 | 10 | (2) |
| | 302,809 | 724,837 | 144,112 | 1,339,184 | 2,705,635 | 2,707,242 |
| Fixed assets, net | 238,261 | 393,821 | 731,292 | 298,161 | 852,815 | 860,292 |
| Security deposit | 5,900 | 5,900 | 105,136 | 126,131 | 126,131 | 126,131 |
| | $546,970 | 1,124,558 | 980,540 | 1,763,476 | 3,684,581 | 3,693,665 |
| *Liabilities and Member's Equity* | | | | | | |
| Current liabilities: | | | | | | |
|   Accounts payable | 15,042 | 0 | 27,424 | 0 | 0 | 0 |
|   Payable to client(s) | 205,277 | 2,900 | 141,870 | 201,400 | 388,998 | 388,998 |
|   Other liabilities | 31,343 | 117,049 | 2,650 | 117,359 | 1,837,326 | 164,314 |
| | 251,662 | 119,949 | 171,944 | 318,759 | 2,226,324 | 553,312 |
| Line of credit | 130,000 | 599,135 | 699,135 | 502,948 | 803,530 | 803,530 |
| Notes payable | 0 | 0 | 0 | 345,000 | 404,370 | 298,370 |
| Long-term liabilities | 0 | 0 | 617,550 | 0 | 0 | 0 |
| Reconciliation—accounting | 0 | 337,370 | 0 | 0 | 0 | 0 |
| | 381,662 | 1,056,454 | 1,488,629 | 1,166,707 | 3,434,224 | 1,655,212 |
| *Member's Equity* | 165,308 | 68,104 | (508,089) | 596,769 | 250,357 | 2,037,453 |
| | $546,970 | 1,124,558 | 980,540 | 1,763,476 | 3,684,581 | 3,692,665 |

[1]FFA_1722
[2]FFA_1724
[1]FFA_1725
[4]FFA_1727
[5]FFA_0011
[5]FFA_1729

**EXHIBIT 10**

**FLORIDA FORECLOSURE ATTORNEYS, PLLC**

**ACCRUAL-BASIS BALANCE SHEET**

**AS OF THE FOUR YEARS ENDED DECEMBER 31, 2013**

| | Dec-10[1] | Dec-11[2] | Dec-12[3] | Dec-13[4] |
|---|---|---|---|---|
| *Assets* | | | | |
| Current assets: | | | | |
| Cash and cash equivalents | $48,174 | 241,049 | 191,997 | 604,835 |
| Client trust accounts | 0 | 0 | 0 | 0 |
| Escrow accounts | 0 | 0 | 0 | 35,617 |
| Due from 399 Holdings, LLC | 0 | 0 | 0 | 0 |
| Loan to partners | 0 | 202,470 | 199,244 | 907,874 |
| Note receivable—Kossoff | 0 | 0 | 575,000 | 0 |
| Other current assets | 232,128 | 14,738 | 16,736 | 103,025 |
| Balancing adjustment | 0 | (2) | 0 | 0 |
| | 280,302 | 458,255 | 982,977 | 1,651,351 |
| Fixed assets, net | 187,866 | 396,444 | 298,161 | 498,478 |
| Security deposit | 5,900 | 5,900 | 105,136 | 126,131 |
| Balancing adjustment | 0 | 0 | 0 | (100,000) |
| | $474,068 | 860,599 | 1,386,274 | 2,175,960 |
| *Liabilities and Partners' Equity* | | | | |
| Current liabilities: | | | | |
| Payable to client(s) | 175,692 | 12,084 | 144,319 | 0 |
| Line of credit | 130,000 | 729,135 | 1,136,635 | 502,948 |
| Other liabilities | 31,342 | 15,365 | 27,626 | 1,673,012 |
| | 337,034 | 756,584 | 1,308,580 | 2,175,960 |
| Due to partners | 51,064 | 0 | 0 | 0 |
| | 388,098 | 756,584 | 1,308,580 | 2,175,960 |
| *Partners' Equity* | 85,970 | 104,015 | 77,694 | 0 |
| | $474,068 | 860,599 | 1,386,274 | 2,175,960 |

[1]FFA_0001
[2]FFA_0005
[3]FFA_0008
[4]FFA_0009



**EXHIBIT 11**
**FFA MONTHLY CASH-BASIS REVENUES:  JANUARY 2013 - JUNE 2015**

*Source:  QuickBooks schedules produced by the Defendants*

**EXHIBIT 12**
**FLORIDA FORECLOSURE ATTORNEYS, PLLC**
**SUMMARY OF TAXABLE INCOME**
**FOR THE THREE YEARS ENDED DECEMBER 31, 2011**

|  | 2009 | 2010 | 2011 |
|---|---|---|---|
| Revenues | $2,301,013 | 2,753,187 | 6,042,372 |
| Cost of revenues: | | | |
|    Attorney attendee costs | (122,427) | (153,164) | (235,660) |
|    Employee leasing costs | (120,000) | 0 | (3,370,676) |
|    FedEx/courier expense | (52,503) | (29,257) | (69,478) |
|    Online fee—client systems | 0 | (207) | (406,316) |
|    Sales and marketing | (114,700) | 0 | 0 |
|    Title policy premiums | (6,701) | (2,900) | 0 |
|    Title searches | (25,820) | (10,200) | 0 |
| | (442,151) | (195,728) | (4,082,130) |
| | | | |
| Gross profit | 1,858,862 | 2,557,459 | 1,960,242 |
| | | | |
| Operating expenses: | | | |
|    Casual labor | (14,687) | (43,403) | (2,172) |
|    Computer expense | (8,965) | (3,435) | (89,088) |
|    Equipment leasing | (17,040) | (23,771) | (65,677) |
|    Employee insurance | (127,643) | (159,369) | (257,555) |
|    Employee motivation | 0 | | (72,202) |
|    Employee salaries | (1,182,740) | (1,371,238) | 0 |
|    Maintenance | (17,187) | (16,675) | (25,195) |
|    Malpractice insurance | 0 | 0 | (45,627) |
|    Meeting expense | (41,607) | (61,297) | (13,207) |
|    Office supplies and expense | (69,084) | (42,634) | (105,611) |
|    Online fees | (9,529) | (70,046) | 0 |
|    Payroll taxes | (86,534) | (87,798) | 0 |
|    Postage & shipping | (37,928) | (40,384) | (114,855) |
|    Professional fees | (24,164) | (40,731) | (64,915) |
|    Referral fees | (26,543) | (56,725) | (1,238) |
|    Rent | (82,738) | (94,527) | 0 |
|    Taxes & licenses | (614) | (14,835) | (42,285) |
|    Travel | (7,070) | (275,151) | (514,482) |
|    Vehicle expenses | 0 | (7,683) | (30,109) |
|    Other | (104,135) | (135,106) | (121,815) |
| | (1,843,521) | (2,501,405) | (1,563,861) |
|    Rent | 0 | 0 | (262,582) |
|    Depreciation | 0 | 0 | (109,646) |
| | (1,843,521) | (2,501,405) | (1,936,089) |
| | | | |
| Operating income | $654 | 5,659 | 24,153 |
| | | | |
| Felderbaum compensation | 0 | 0 | 0 |
| Felderbaum distributions | 0 | 0 | 0 |
| Ownership: | | | |
|    Rickey S. Felberbaum | 99.0% | 99.0% | 99.0% |
|    Felberbaum and Associates | 1.0% | 1.0% | 1.0% |

Source:  U.S. Return of Partnership Income and supporting schedules

| EXHIBIT 13 FLORIDA FORECLOSURE ATTORNEYS, PLLC BALANCE SHEET SUMMARY AS OF THE THREE YEARS ENDED DECEMBER 31, 2011 | | | |
|---|---|---|---|
| | **12/31/09** | **12/31/10** | **12/31/11** |
| *Assets* | | | |
| Cash | $10,590 | 48,174 | 241,049 |
| Other current assets | 0 | 232,128 | 14,736 |
| Loans to partners | 0 | 0 | 202,470 |
| Fixed assets, net | 81,202 | 187,866 | 396,444 |
| Security deposit | 0 | 5,900 | 5,900 |
| | $91,792 | 474,068 | 860,599 |
| *Liabilities* | | | |
| Payroll and insurance W/H | 0 | 31,342 | 15,365 |
| Payables to clients | 0 | 175,692 | 12,084 |
| Line of credit | 0 | 130,000 | 729,135 |
| Other liabilities | 0 | 51,064 | 0 |
| Note payable to partner | 11,481 | 0 | 0 |
| | 11,481 | 388,098 | 756,584 |
| *Partners' Capital Accounts* | 80,311 | 85,970 | 104,015 |
| | $91,792 | 474,068 | 860,599 |

Source:  U.S. Return of Partnership Income and supporting schedules

**EXHIBIT 14**

**FLORIDA FORECLOSURE ATTORNEYS, PLLC**

**QUICKBOOKS INCOME DETAIL**

**FOR THE FIVE YEARS ENDED DECEMBER 31, 2014**

| | 2010[1] | 2010[2] | 2011[3] | 2011[4] | 2012[5] | 2012[6] | 2013[7] | 2013[8] | 2014[9] | FFA | 2014[10] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Cash | Accrual | Cash | Accrual | Cash | Accrual | Cash | Accrual | Cash | Adjustments | Cash-Alt |
| Revenues | 3,504,818 | 2,753,187 | 6,043,234 | 6,042,372 | 11,950,375 | 11,918,706 | 17,799,581 | 16,950,477 | 18,020,871 | 97,113 | 18,117,984 |
| | | | | | | | | | | | |
| Cost of revenues: | | | | | | | | | | | |
| Attorney attendee costs | (152,529) | (153,164) | (216,723) | (236,880) | (295,515) | (295,515) | | | | | |
| Employee leasing expense | | | | (3,370,676) | | | | | | | |
| FedEx/courier | | | | (69,478) | | | | | | | |
| Processing costs | | | | | | (100,771) | | | | | |
| Other | (13,307) | (42,564) | (500) | | | (2,000) | | | | | |
| | (165,836) | (195,728) | (217,223) | (3,677,034) | (295,515) | (398,286) | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | | | | | |
| Expenses: | | | | | | | | | | | |
| Charitable contributions | | | | | | | | (21,801) | | | (21,801) |
| Abantioned business reimbursement | | | | | | (102,000) | | | | | |
| Administrative fees | | | | (455) | | | | | | | |
| Advertising & promotion | | (3,040) | | (442) | | (6,167) | | (11,350) | | | |
| Auto expenses | (7,683) | | (30,109) | | (102,134) | | (163,493) | | (152,490) | | (152,490) |
| Bank charges | | (7,290) | | (13,707) | | (15,884) | | (25,119) | | | |
| Cable | | | | | | (2,352) | | (9,322) | | | |
| Casual labor—attorney, legal | (43,403) | (43,403) | (2,172) | (2,172) | | | | | | | |
| Cleaning services | | | | | | (10,123) | | (93,688) | | | |
| Client expenses | (67,741) | | (1,355) | | (432,860) | (490,243) | (705,252) | | (861,394) | | (861,394) |
| Client errors | | (11,032) | | | | | | | | | |
| Client promotion | | (1,600) | | | | | | | | | |
| Communication expenses | (12,408) | | (19,613) | | (72,838) | | (129,877) | (129,877) | (140,148) | (7,474) | (147,622) |
| Computer consulting expenses | | (40,731) | | | | | | (494,247) | | | |
| Computer expenses | (67,937) | (3,435) | (154,775) | (89,088) | (383,540) | (350,510) | (571,690) | (571,690) | (605,867) | | (605,867) |
| Depreciation | | (50,395) | | (109,646) | | (315,388) | | (90,157) | | | |
| Document shredding | | | | | | (2,834) | | (13,297) | | | |
| Dues and subscriptions | | (21,293) | | (36,213) | | (27,721) | | (71,656) | | | |
| Employee motivation | | | | (72,202) | | (15,812) | | | | | |
| Employee recruitment/screening | | (7,101) | | (6,501) | | (4,116) | | (114,946) | | | |
| Equipment leasing | | (23,771) | | (65,677) | | (89,758) | | | | | |
| Insurance expenses | (167,273) | (159,369) | (319,064) | (320,116) | (363,919) | (363,919) | (605,300) | (605,300) | (732,809) | | (732,809) |
| Legal fees | | | | | | | | (596,506) | | | |
| Licenses | | | | | | | | (20,779) | | | |
| Maintenance and repairs | | (16,676) | | (26,195) | | (22,402) | | (74,070) | | | |
| Meeting expense | | (61,297) | | (13,207) | | (108,182) | | (149,995) | | | |
| Moving expense | | | | | | (8,834) | | (3,455) | | | |
| Networking | | | | | | (910) | | | | | |
| Office supplies | | (42,634) | | (105,611) | | (135,703) | | (191,831) | | | |
| Operating expenses | (320,247) | | (781,427) | | (1,602,031) | | (3,084,982) | | (2,214,571) | 138,799 | (2,075,772) |
| Outside services | (6,424) | | | | (650,068) | | (1,204,976) | | (657,135) | (115,000) | (772,135) |

**EXHIBIT 14**
**FLORIDA FORECLOSURE ATTORNEYS, PLLC**
**QUICKBOOKS INCOME DETAIL**
**FOR THE FIVE YEARS ENDED DECEMBER 31, 2014**

| | 2010[1] | 2010[2] | 2011[3] | 2011[4] | 2012[5] | 2012[6] | 2013[7] | 2013[8] | 2014[9] | FFA | 2014[10] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Cash | Accrual | Cash | Accrual | Cash | Accrual | Cash | Accrual | Cash | Adjustments | Cash-Alt |
| Payroll expenses | (1,471,662) | | (72,415) | | (6,244,264) | | (9,093,803) | (8,300,284) | (8,484,191) | | (8,484,191) |
| Payroll processing fees | | (12,753) | (3,376,459) | | | (68,791) | | (78,035) | | | |
| Payroll taxes | | (87,798) | | | | (502,368) | | (704,949) | | | |
| Pension | | | | | | (3,811) | | | | | |
| Plant lease | | | | | | | | (10,558) | | | |
| Postage and shipping | (40,384) | (40,384) | (114,855) | (114,855) | (116,173) | (255,962) | (141,115) | (261,533) | (126,699) | | (126,699) |
| Professional fees/consulting | | (6,424) | | (64,915) | | (599,469) | | | | | |
| Rent expense | | (94,527) | | (262,582) | | (794,653) | | (1,362,441) | | | |
| REO expenses | | | | | (49,948) | (49,948) | (538,575) | (545,451) | (780,051) | | (780,051) |
| Referral fees | | (56,725) | | (1,236) | | | | | | | |
| Salaries and wages | | (1,371,238) | | | | (5,670,990) | | | | | |
| Seminars | | (370) | | (5,033) | | (22,074) | | (35,764) | | | |
| Signage | | | | | | (1,349) | | | | | |
| Supplies—other | | | | (11,374) | | | | | | | |
| Taxes and licenses | | (14,835) | | (42,285) | | (67,132) | | | | | |
| Telephone | | (12,408) | | (19,415) | | (65,875) | | | | | |
| Travel expenses | (275,151) | (276,151) | (514,482) | (514,462) | (498,950) | (645,800) | (432,032) | (432,032) | (401,188) | | (401,188) |
| Utility expenses | (1,101) | (1,101) | (26) | (26) | (4,231) | (4,231) | (11,729) | (11,731) | (13,556) | | (13,556) |
| Vehicle expenses | | (7,683) | | (30,109) | | (11,229) | | (81,747) | | | |
| Warehouse & storage | | (6,783) | | (9,543) | | (17,778) | | (21,391) | | | |
| 7036 online fees—client systems | (70,046) | (70,046) | (406,316) | (406,316) | (620,311) | (620,311) | (365,160) | (385,160) | (220,174) | | (220,174) |
| 9000 hard costs written off | (426) | | | (1,165) | (6,509) | (2,245) | (17,581) | (17,881) | (13,956) | | (13,956) |
| Unreconciled difference | (1) | 493 | (1) | (19,022) | (1) | (25,053) | (2) | (2) | 0 | (2) | (2) |
| | (2,551,887) | (2,551,800) | (5,794,234) | (2,362,405) | (11,147,777) | (11,501,927) | (17,065,567) | (15,503,271) | (15,426,030) | 16,323 | (15,409,707) |
| | | | | | | | | | | | |
| Other income, net: | | | | | | | | | | | |
| Client costs, net of reimbursements | (802,542) | | 567,994 | | | | 1,206,609 | (705,252) | 641,189 | (1,649) | 639,540 |
| Bad debt | | | | | | | | (500,000) | | | |
| Interest income | | | | | | 1,465 | | | | | |
| Interest expense | | | | (6,108) | | (48,279) | | (110,959) | | | |
| Other expenses, net | | | | | | | | (1,344) | 101,870 | (101,870) | 0 |
| | (802,542) | 0 | 567,994 | (6,108) | 0 | (46,814) | 1,206,609 | (1,317,555) | 743,059 | (103,519) | 639,540 |
| | | | | | | | | | | | |
| Net income | (15,447) | 5,659 | 599,771 | (3,175) | 507,083 | (28,321) | 1,940,623 | 129,651 | 3,337,900 | 9,917 | 3,347,817 |

[1] FFA 1731
[2] FFA 0004
[3] FFA1732
[4] FFA 0006
[5] FFA 1733
[6] FFA 0008
[7] FFA 1734
[8] FFA 1735
[9] FFA 0010
[10] FFA 0012

**EXHIBIT 15**
**FLORIDA FORECLOSURE ATTORNEYS, PLLC**
**DEVELOPMENT OF ACCRUAL INCOME STATEMENT**
**FOR THE YEAR ENDED DECEMBER 31, 2014**

| | YTD Sep-14 | Oct-14 | Nov-14 | Dec-14 | Y/E Dec-14 |
|---|---|---|---|---|---|
| Income | $13,880,950 | 1,582,591 | 1,063,239 | 1,103,968 | 17,630,748 |
| | | | | | |
| Expenses: | | | | | |
|   Auto expenses | (111,932) | (33,629) | (15,898) | (9,538) | (170,997) |
|   Charitable contributions | | (9,000) | | | (9,000) |
|   Client expenses | (819,355) | (102,876) | (59,982) | (61,307) | (1,043,520) |
|   Communication expenses | (100,156) | (10,522) | (11,214) | (11,947) | (133,839) |
|   Computer expenses | (489,506) | (61,722) | (52,855) | (39,499) | (643,582) |
|   Insurance | (591,879) | (5,067) | (62,293) | 8,215 | (651,024) |
|   Miscellaneous | (1,021) | | | | (1,021) |
|   Operating expenses | (1,572,252) | (204,468) | (280,764) | (120,257) | (2,177,741) |
|   Outside services | (561,188) | (49,712) | (77,979) | (71,029) | (759,908) |
|   Payroll | (6,283,883) | (958,107) | (625,724) | (618,511) | (8,486,225) |
|   Postage expenses | (101,190) | (9,738) | (8,256) | (7,757) | (126,941) |
|   REO expenses | (552,500) | (84,315) | (65,811) | (64,463) | (767,089) |
|   Settlement fees | (50,625) | | | | (50,625) |
|   Travel | (335,461) | (27,540) | (22,571) | (14,877) | (400,449) |
|   Utilities | (9,723) | (2,718) | (1,367) | (1,650) | (15,458) |
|   4055-attendee costs | (55) | (25,885) | | | (25,940) |
|   7036-online fees-client systems | (198,127) | | (9,912) | (19,555) | (227,594) |
|   9000-hard costs written off | (3,764) | | (2,239) | (16,376) | (22,379) |
|   Rounding/unaccounted for | 0 | (1) | 1 | | 0 |
| | (11,782,617) | (1,585,300) | (1,296,864) | (1,048,551) | (15,713,332) |
| | | | | | |
| Client costs net of reimbursement | 288,235 | 71,091 | 113,015 | 72,378 | 544,719 |
| | | | | | |
| Net income | $2,386,568 | 68,382 | (120,610) | 127,795 | 2,462,135 |

Source:  FFA_1747 and FFA_1908-21



**EXHIBIT 16**
**FFA DISTRIBUTIONS:  JANUARY 2011 - JUNE 2015**

*Sources*:  FFA 1724, 1726, 1728, 0011, 2009, 2006, 2000, 1994, 1988, 1984

| | | | | |
|---|---|---|---|---|
| $241,709 | $1,701,836 | $1,421,547 | $3,101,925 | $648,405 |
| 2011 | 2012 | 2013 | 2014 | YTD 6-15 |

**EXHIBIT 17**
**FLORIDA LEADS THE NATION IN FORECLOSURES**

## Top foreclosure states July: Florida

By Chris Kahn • Bankrate.com



## Foreclosures: Florida

**1 in every 408** housing units received a foreclosure filing.

- Change in filings from June: **Up 19%**
- Nationally: 1 in every 1,057

**EXHIBIT 18**
**FORECLOSURE RATE IN THE STATE OF FLORIDA**



*Source:  RealtyTrac, August 2015*

**EXHIBIT 19**
**MONTHLY FORECLOSURES IN THE STATE OF FLORIDA**



*Source:  RealtyTrac, August 2015*



**EXHIBIT 20**
**FFA ANNUAL REVENUES:  CASH AND "ACCRUAL" BASIS**

| Year | Cash Basis | "Accrual" Basis |
|------|-----------|-----------------|
| 2010 | $3,504,818 | $2,753,187 |
| 2011 | $6,043,234 | $6,042,372 |
| 2012 | $11,950,375 | $11,918,706 |
| 2013 | $17,799,581 | $16,950,477 |
| 2014 | $18,117,984 | $17,630,748 |

Cash Basis    "Accrual" Basis

*Source:  Exhibits 5 and 7*





**EXHIBIT 22**
**FFA ANNUAL CASH & "ACCRUAL" NET INCOME  AND DISTRIBUTIONS**

Sources:  Exhibits 5, 7, and 16



**EXHIBIT 23**
**FFA CUMULATIVE CASH & "ACCRUAL" NET INCOME AND DISTRIBUTIONS**

Source: Exhibit 22

■ Cumulative Cash-Basis Net Income   ■ Cumulative "Accrual"-Basis Net Income   ■ Cumulative Distributions



EXHIBIT 24:  SEGMENTATION OF U.S. LAW FIRMS BY STAFF SIZE

10 - 19
2.8%

5 - 9
5.6%

20 - 99
2.1%

100 - 499
0.8%

500+
0.4%

1 - 4
88.3%

Sauce:  IBISWorld, 5/14,
as quoted in
BRG Reference Guide

**EXHIBIT 25**
**FLORIDA FORECLOSURE ATTORNEYS, PLLC**
**CALCULATION OF THE DEFENDANTS' UNJUST ENRICHMENT**
**BASED ON THE INCOME APPROACH**
**AS OF APRIL 30, 2013**

| Period | Calculation | Net Income | Plaintiff's Percentage[7] | Unjust Enrichment |
|---|---|---|---|---|
| | | a | b | a x b |
| Year ended 12/31/11[1] | | $599,771 | 22.0% | $131,950 |
| Year ended 12/31/12[1] | | 507,083 | 22.0% | 111,558 |
| January 2013[2] | | (29,163) | 22.0% | (6,416) |
| February 2013[3] | | 722,191 | 22.0% | 158,882 |
| March 2013[4] | | 411,438 | 22.0% | 90,516 |
| April 2013[5] | | 447,242 | 22.0% | 98,393 |
| | | | | 584,884 |
| Terminal value: | | | | |
| Income for Y/E 12/31/13[1] | $1,940,623 | | | |
| | ÷ | | | |
| Capitalization rate[6] | 18.57% | | | |
| | $10,449,248 | 10,449,248 | 22.0% | 2,298,835 |
| | | | | $2,883,718 |

**Rounded Calculation of Unjust Enrichment**
**$2,875,000**

[1]*Exhibit 5*

[2]FFA_1767

[3]FFA_1783

[4]FFA_1779

[5]FFA_1800

[6]Cost of equity capital based on the Build-Up Method:

| | |
|---|---|
| Risk-free rate[a] | 2.50% |
| Equity risk premium[b] | 6.70% |
| Industry risk premium[c] | -0.05% |
| Microcap size premium[d] | 6.03% |
| Lack of marketability premium[e] | 3.39% |
| | 18.57% |

[a]Yield on 20-year UST bond on 4/30/13 per *The Wall Street Journal* online

[b]Excess of long-term total return of large-cap common stocks over long-term U.S. Treasury bonds, *Ibbotson SBBI 2013 Valuation Yearbook*, p. 216

[c]*Op. cit.*, p. 39, as computed for business services

[d]Size premium for decile reflecting smallest companies, *op. cit.*, p. 216

[e]Excess return of the Cambridge Private Equity Index over the Wilshire 5000 for the 25 years ended 12/31/12, as reported in *Cambridge Associates LLC*, December 31, 2012, *U.S. Private Equity Index® and Selected Benchmark Statistics*, p. 3

[7]Percent of FFA equity that the Plaintiff had agreed to accept as Consideration

## EXHIBIT 26
## FLORIDA FORECLOSURE ATTORNEYS, PLLC
## CALCULATION OF THE DEFENDANTS' UNJUST ENRICHMENT
## BASED ON THE DISTRIBUTIONS APPROACH
## AS OF APRIL 30, 2013

| Period | Distributions & Other | Total | Plaintiff's Percentage[5] | Unjust Enrichment |
|---|---|---|---|---|
| | | a | b | a x b |
| Year ended 12/31/11[1] | | $241,709 | 22.0% | $53,176 |
| Year ended 12/31/12[1] | | 1,701,836 | 22.0% | 374,404 |
| Through 4/30/13: | | | | |
| Distributions for Y/E 12/31/13[1] | $1,421,547 | | | |
| | x | | | |
| Proration through 4/30/13[2] | 4/12 | | | |
| | $473,849 | 473,849 | 22.0% | 104,247 |
| | | | | 531,827 |
| Terminal value: | | | | |
| Distributions for Y/E 12/31/13[1] | $1,421,547 | | | |
| Increase in cash & cash equivalents[3] | 349,121 | | | |
| Increase loans to shareholder[3] | 907,874 | | | |
| Net repayment of line of credit & notes payable[3] | 468,737 | | | |
| Distributions capability | $3,147,279 | | | |
| | ÷ | | | |
| Capitalization rate[3] | 18.57% | | | |
| | $16,946,465 | 16,946,465 | 22.0% | 3,728,222 |
| | | | | $4,260,049 |

### Rounded Calculation of Unjust Enrichment
### $4,250,000

[1]*Exhibit 16*

[2]

| | Cash & Cash Equivalents | Shareholder Loan | Line of Cr. & Notes Payable | Reference |
|---|---|---|---|---|
| 12/31/13 | $381,499 | 907,874 | 847,948 | *Exhibit 9* |
| 12/31/12 | (32,378) | 0 | (1,316,685) | *Exhibit 9* |
| Net increase | $349,121 | 907,874 | (468,737) | |

[2]Due to lack of reliable interim financial statements, CCA pro rated annual earnings to reflect the portion of the year through 4/30/13—the date by which Mr. Kossoff was terminated by the Defendants

[4]Cost of equity capital was calculated based on the Build-Up Method, as detailed in footnote 3 of *Exhibit 25*

[5]Percent of FFA equity that the Plaintiff had agreed to accept as Consideration

**EXHIBIT 27**

**FLORIDA FORECLOSURE ATTORNEYS, PLLC**

**VERIFICATION OF THE REASONABLENESS OF THE**

**CALCULATIONS OF THE DEFENDANTS' UNJUST**

**ENRICHMENT BASED ON THE LODESTAR METHOD**

**AS OF APRIL 30, 2013**

| | Work Weeks | Est. Hours Worked/ Week | Hours |
|---|---|---|---|
| Hours serving FFA:[1] | | | |
| Year ended 12/31/11 | 50 | 30 | 1,500 |
| Year ended 12/31/12 | 50 | 30 | 1,500 |
| Four months ended 4/30/13 | 16 | 15 | 240 |
| | | | 3,240 |
| | | | x |
| Applicable hourly billing rate[2] | | | $692.77 |
| | | | $2,244,564 |

*Note:*  the above fees would be noncontingent, payable on a regular basis, and do not include success fees that may be charged on a turnaround case

[1]Based on estimate of Mr. Kossoff

[2]Billing rates of insolvency consultants filed in Florida bankruptcy cases:

| Firm | Position | Ave. Hourly Billing Rate |
|---|---|---|
| Alix Partners, LLP[a] | Managing Director | $505.00 |
| Alvarez & Marsal N. America, LLC[b] | Managing Director | $728.27 |
| FTI Consulting, Inc.[c] | Sr. Managing Director | $657.26 |
| Navigant Capital Advisors, LLC[d] | Sr. Managing Director | $822.50 |
| Median | | $692.77 |

[a]HearUSA, West Palm Beach Division, 2011

[b]NII Holdings, Inc., *et al.*, Coral Gables, FL, 2014

[c]First NLC Financial Services, LLC *et al.*, West Palm Beach Division, 2008

[d]Life Care St. Johns, Inc., Jacksonville Division, 2013

**EXHIBIT 28**

# Chartered Capital Advisers, Inc.

### 375 Park Avenue • Suite 2607
### New York, New York 10152
### (212) 327-0200 • (212) 327-0225 Fax
### www.charteredcapital.com

## A DESCRIPTION OF CHARTERED CAPITAL ADVISERS, INC.

Chartered Capital Advisers, Inc. provides merger & acquisition, valuation, and corporate financial advisory services on behalf of corporate clients, investors, financial institutions, attorneys, accountants, and participants in employee benefit plans.  The Firm has a unique blend of seasoned professionals with extensive financial advisory and operational experience.  *All* of the professionals at Chartered Capital Advisers have occupied senior positions at Big Four accounting firms, investment banks, commercial banks, valuation and appraisal firms, or in private industry.

Key services provided by Chartered Capital Advisers include:

- Valuations and fairness opinions

- Financial and operational reviews of acquisition candidates

- Financial restructuring or recapitalization

- Negotiating assistance

- Expert testimony

- Acquisition searches

- Market and industry analyses

- Preparing information memoranda

- Developing business plans and financial projections, and

- Representing buyers and sellers of businesses

Each project is custom tailored to the unique requirements of the client and situation.  The degree of involvement by Chartered Capital Advisers professionals can range from consultation on specific issues to comprehensive merger & acquisition, valuation or other special projects.  A more detailed list of the range of services provided by Chartered Capital Advisers is contained in the accompanying exhibit.

Prior to initiating an engagement, it is the practice of Chartered Capital Advisers to clearly establish the scope of professional services to be rendered, time requirements, expected results, and anticipated fees.  Throughout the course of an engagement our professionals remain in close communication with our client to ensure that the client is apprised of all significant developments on a timely basis.  The professionals of Chartered Capital Advisers welcome your inquiries.

CHARTERED CAPITAL ADVISERS, INC.

## EXHIBIT 28, continued
## EXAMPLES OF OUR SERVICES

MERGERS & ACQUISITIONS
- Developing acquisition criteria
- Industry analyses
- Identifying and screening acquisition candidates
- Initiating contacts with target companies
- Due diligence
- Operational reviews
- Financial reviews
- Financial projections
- Pro forma analyses
- Pricing and valuation
- Structuring the transaction
- Negotiating the transaction
- Obtaining financing
- Integrating the acquired entity

SALES AND DIVESTITURES
- Preparing selling memoranda
- Identifying prospective buyers
- Initiating buyer contacts
- Pricing and valuation
- Orchestrating buyer due diligence
- Fulfilling buyer information requests
- Structuring the transaction
- Minimizing income taxes paid
- Negotiating the transaction

LITIGATION SUPPORT
- Expert affidavits and reports
- Expert testimony
- Mediation and arbitration
- Third-party neutral
- Securities litigation
- Shareholder disputes
- Class action cases
- Business dissolution
- Equitable distribution
- Insolvency litigation
- Investment suitability
- Fraudulent conveyances
- Economic and financial damages
- Valuation
- Forensic accounting
- Fraud investigation
- Lost earnings and profits
- Bankruptcy accountants, financial advisors, examiners, and trustees

VALUATIONS AND FAIRNESS OPINIONS
- Mergers & acquisitions
- Sales and divestitures
- Solvency opinions
- Insolvency opinions
- Buy/sell agreements
- Recapitalizations
- Shareholder transactions
- Capital infusions
- Employee Stock Ownership Plans
- Expert testimony
- Estate planning and taxation
- Gift taxes
- Collateral valuations
- Patents, copyrights, trademarks, and other intellectual property and intangible assets
- Employment and noncompete agreements
- Venture capital investments
- Section 409A valuations
- FASB 141R purchase price allocations
- FASB 142 goodwill and other intangible asset impairment analyses
- FASB 123R share-based compensation
- FASB 157/159 fair value analyses
- Restricted stock
- Investment company and private equity portfolios
- Loans, notes payable, fixed-income securities, and other debt instruments
- Convertible debt and preferred stock
- Junior and senior equity
- Stock options and warrants
- Real options
- Complex capital structures
- Structured securities and other derivative financial instruments
- Liquidation analyses

OTHER SERVICES
- Business plans
- Financial projections
- Financial restructuring
- Credit risk evaluation
- Negotiating assistance
- Investor and lender presentations
- Accounting and financial guidance
- Lectures and seminars
- Board of directors advisory services

CHARTERED CAPITAL ADVISERS, INC.

## EXHIBIT 28, continued
# PROFESSIONAL LEADERSHIP

**Participation in Professional Organizations**
American Bankruptcy Institute
American Institute of Certified Public Accountants
American Society of Appraisers
Association of Certified Turnaround Professionals
Association of Insolvency and Restructuring Advisors
CFA Institute
National Association of Certified Fraud Examiners
The National Center for Employee Ownership
New York Society of Security Analysts
New York State Society of CPAs (chairman and member of various committees)
The Institute of Business Appraisers
Turnaround Management Association (Executive Committee of the Board of Directors)

**Quintero Index of Bankrupt Stocks**
Released weekly to several national periodicals

**Articles in National Publications**

| | |
|---|---|
| *American Bankruptcy Institute Journal* | *Bankruptcy Court Decisions* |
| *Bankruptcy Law Review* | *Barron's* |
| *Bloomberg Personal* | *Boardroom Reports* |
| *Chapter 11 Reporter* | *The CPA Journal* |
| *Detroit Legal News* | *Euromoney* |
| *The Florida Bar Journal* | *Investor's Daily* |
| *Journal of Business Strategy* | *Management Focus* |
| *National Bankruptcy Reporter* | *The Newsletter of Corporate Renewal* |
| *The Secured Lender* | *Turnarounds & Workouts* |
| *Viewpoint on Value* | *The Wall Street Journal* |

**Contributions to Major Books**

| | |
|---|---|
| *The Acquisitions Manual* | *The Bankruptcy Yearbook & Almanac* |
| *The CPA's Basic Guide to Mergers & Acquisitions* | *Handbook of Business Strategy* |
| *Investing in Bankruptcies and Turnarounds* | *The New Era of Investment Banking* |

**Authors of Professional Manuals and Audiocassette Programs**
*Credit Management and Debt Restructuring*
*Due Diligence: The Key to Securing a Good Deal*
*Investment Banking*
*Mergers and Acquisitions*
*The CPA's Role in Financial Restructuring and Bankruptcy*
*Valuations of Closely Held Companies and Partnerships*

**Lectures to Professional Audiences**

| | |
|---|---|
| American Institute of CPAs | American Management Association |
| Assoc. of Certified Turnaround Professionals | Association for Corporate Growth |
| Center for Professional Education | Financial Executives Institute |
| Institute of International Research | Natl. Assn. of Certified Valuators & Analysts |
| Natl. Assn. of Mgmt. & Tech. Asst. Ctrs. | New York Institute of Finance |
| New York Society of Security Analysts | New York State Society of CPAs |
| Turnaround Management Association | Visiting International Professional Program |

Numerous special seminars for banks, brokerage firms, law firms, and accounting firms

**EXHIBIT 29**



# RONALD G. QUINTERO, CPA, CFA, ABV, CDBV, CFE, CFF, CTP, CIRA

Managing Director • Chartered Capital Advisers, Inc.
375 Park Avenue, Suite 2607 • New York, NY 10152
(212) 327-0200 • (212) 327-0225 FAX • q@charteredcapital.com
www.charteredcapital.com

## Areas of Expertise
- Valuations of businesses, financial instruments, and intangible assets
- Financial restructuring
- Bankruptcy & insolvency
- Mergers & acquisitions
- Forensic accounting
- Investments
- Financial damages

## Expert Testimony
- Testified as an expert witness on more than 60 occasions in courts and arbitrations throughout the United States

## Professional Experience
- More than 35 years' experience as a senior financial professional at leading firms
- Founded Chartered Capital Advisers and its affiliate, R. G. Quintero & Co., in 1988
- Investment banker at Bear, Stearns & Co., Inc.
- Insolvency and restructuring advisor at Zolfo, Cooper & Co.
- Started and ran the first valuation practice of KPMG

## Education
- A.B., Economics and Spanish, Lafayette College
- M.S., Accountancy, New York University Stern School of Business
- A.P.C., Investment Management, New York University Stern School of Business

## Certifications
- Certified Public Accountant, New York
- Chartered Financial Analyst
- AICPA-Accredited in Business Valuation
- Certification in Distressed Business Valuation
- Certified Fraud Examiner
- AICPA-Certified in Financial Forensics
- Certified Management Accountant
- Certified Insolvency and Restructuring Advisor
- Certified Turnaround Professional
- Certified Financial Planner

## Professional Activities
- Served more than 750 public and private clients of all sizes in a broad range of industries
- Performed more than 1,000 valuations of businesses, financial instruments, intangible assets, and other assets and liabilities
- Served boards of directors of public, private, and nonprofit organizations as member or advisor
- Appointed as bankruptcy examiner, bankruptcy trustee, and neutral in litigation
- Award-winning scholar, lecturer, and writer
- Profiled in several "who's who" publications during the past 20 years
- Interviewed and profiled in several national publications, as well as network television
- Delivered hundreds of lectures and seminars to more than 10,000 professionals throughout North America, South America, Europe, Asia, and Australia, some of which have been made available for commercial sale in audio, video, and online format
- Most active trainer of CFA candidates in the world over the past 20 years
- Prolific author of articles in national publications, chapters in leading professional books, professional manuals, and self-study texts
- Member of several professional organizations, including the American Institute of Certified Public Accountants, the CFA Institute, the New York Society of Security Analysts, the Turnaround Management Association, and the American Bankruptcy Institute
- Served as member or committee chairman of several committees of the New York State Society of Certified Public Accountants, as well as Treasurer and member of the Executive Committee of the Board of Directors of the Turnaround Management Association

**EXHIBIT 30**

**DEPOSITIONS AND EXPERT TESTIMONY OF RONALD G. QUINTERO:  2011 THROUGH 2015**

| Year | City, State | Testimony or Deposition | Client[1] | Opposing Party or Company |
|------|-------------|-------------------------|-----------|---------------------------|
| 2012 | Santa Barbara, CA | Deposition | Joel R. Baker | John R. Behrmann *et al.* |
| 2012 | Queens, NY | Testimony | Tomasz Brzostowski | Edyta B. Brzostowski |
| 2012 | Tampa, FL | Deposition | Lazy Days' R. V. Center, Inc. | I-4 Land Holding Limited Co. |
| 2013 | Miami, FL | Deposition | Stiefel Laboratories, Inc. | 100079 Canada, Inc. |
| 2013 | Tampa, FL | Testimony | Lazy Days' R. V. Center, Inc. | I-4 Land Holding Limited Co. |
| 2013 | New York, NY | Deposition | I-MED Pharma, Inc. | Biomatrix, Inc. *et. al* |
| 2013 | Bronx, NY | Testimony | Dagoberto Abreu | New York City Transit Authority |
| 2013 | San Francisco, CA | Deposition | Madden *et al.* | Cowen & Co. *et al.* |
| 2014 | New York, NY | Testimony | Sam McAfee | Passive House Center, Inc. |
| 2014 | Queens, NY | Testimony | Antoun D. Girgs | Snapple Distribution Corp. *et al.* |
| 2015 | Santa Ana, CA | Testimony | Robert Rivas, Esq. *et al.* | Patrick Merrell *et al.* |
| 2015 | New York, NY | Testimony | Royce Hosiery, LLC *et al.* | Gottesman Co. |
| 2015 | New York, NY | Testimony | Mooreland International LLP | B. Holt Thrasher |
| 2015 | Trenton, NJ | Testimony | Trenton Convalescent Center *et al.* | EliteCare, NJ, LLC |
| 2015 | New York, NY | Deposition | Michael Krynski | T. Chase, Jr. and Western Express, Inc. |
| 2015 | Rochester, NY | Testimony | Rochester Beer & Beverage Corp. | Adam E. Jablonski |

---

[1] Client refers to party on whose behalf Mr. Quintero's firm was engaged.  In many of the cases Mr. Quintero's firm was engaged by legal counsel.

**EXHBIT 31**
**PUBLISHING ACTIVITIES OF RONALD G. QUINTERO, CPA, CFA**

Quintero, Ronald G.  *CFA Level I Review Notes.*  New York:  New York Institute of Finance, 2001.

Quintero, Ronald G.  "Choosing and Using Your Valuation Expert: A Valuation User's Field Guide."  *Viewpoint On Value*, (November/December 1995), 4-5.

Quintero, Ronald G.  "The CPA's Role as Bankruptcy Examiner."  *The CPA Journal*, (September 1991), 42-50.

Quintero, Ronald G.  "The CPA's Role in Turnarounds."  *The CPA Journal*, (September 1989), 18-26 (winner of the 1989 Max Bloch Distinguished Article Award provided by the New York State Society of Certified Public Accountants).

Quintero, Ronald G.  "Determining Whether a Company Is Really a Turnaround Candidate."  In *Investing in Bankruptcies and Turnarounds*, edited by Sumner N. Levine, 283-309.  New York: HarperBusiness, 1991.

Quintero, Ronald G.  "Financial Restructuring."  In *The New Era of Investment Banking*, edited by Raymond H. Rupert, 137-152.  Chicago: Probus Publishing Company, 1993.

Quintero, Ronald G.  "Financial Tools for Strategy Evaluation."  In *Handbook of Business Strategy*, 2nd Edition, edited by Harold E. Glass, 7-1 to 7-62.  Boston: Warren, Gorham & Lamont, Inc., 1991.  (First published in the 1st edition, 1983).

Quintero, Ron and Mayer, Jim.  "Getting Financing for the Turnaround Candidate."  *Faulkner & Gray's Bankruptcy Law Review*, (Spring 1992), 55-60.

Quintero, Ronald G.  "How a Business Valuation Expert Estimates Value."  *The Detroit Legal News*, (October 26, 1988), 4.

Quintero, Ronald G.  "Making Use of Your Valuation Expert."  *The Detroit Legal News*, (November 2, 1988), 4.

Quintero, Ronald G.  *Mergers and Acquisitions*, 3rd Edition.  New York: American Institute of Certified Public Accountants, 1998.  (audiocassettes and workbook; first edition published in 1990).

Ronald G. Quintero.  *Mergers and Acquisitions*.  New York: American Institute of Certified Public Accountants, 1999.

1

**EXHBIT 31**
**PUBLISHING ACTIVITIES OF RONALD G. QUINTERO, CPA, CFA**

Quintero, Ronald G. and Timpson, Roger D.  "The Quintero Index of Bankrupt Stocks: 1992."  In *The Bankruptcy Yearbook & Almanac: 1993*, edited by Christopher M. McHugh, 233-238.  Boston: New Generation Research, 1993.

Quintero, Ronald G., Kowalski, David, and Timpson, Roger D.  "The Quintero Index of Bankrupt Stocks: 1994."  In *The Bankruptcy Yearbook & Almanac: 1995*, edited by Christopher M. McHugh, 260-265.  Boston: New Generation Research, Inc., 1996.

Quintero, Ronald G.  *CFA Level I Q-Notes.*  (New York:  R. G. Quintero & Co., 2002 - 2014)

Quintero, Ronald G.  *CFA Level II Q-Notes.*  (New York:  R. G. Quintero & Co., 2002 - 2014)

Quintero, Ronald G.  *CFA Level III Q-Notes.*  (New York:  R. G. Quintero & Co., 2002 - 2014)

Quintero, Ronald G.  *CFA Financial Statement Analysis Q-Notes.*  (New York:  R. G Quintero & Co., 2003 – 2014)

Quintero, Ronald G.  Review of *Bankruptcy Deadline Checklist: An Easy-to-Use Reference Guide for Case Management and Administration*, by Norman Pernick.  *Turnarounds & Workouts*, (April 1, 1993), 15.

Quintero, Ronald G.  "Selecting a Business Valuation Expert."  *The Detroit Legal News*, (October 14, 1988), 4.

Quintero, Ronald G.  "The Ten Things That Matter."  *Beyond the Numbers*, (October/November 1996), 3-4.

Quintero, Ronald G.  "The Turnaround Buyout Candidate: Deciding How Much to Pay."  *Turnarounds and Workouts*, (February 15, 1993), 8-9.

Quintero, Ronald G.  "Using Workout Professionals on Troubled Credits."  *The Secured Lender*, (July/August 1991), 6-12.

Quintero, Ronald G. and Schwechter, Loren H.  "Valuing the Professional Service Corporation."  *The Florida Bar Journal*, (June 1983), 431-433.  (Also published in *Equitable Distribution Reporter*, June 1983), 142-144.

Quintero, Ronald G. and Shaw, John C.  "What Is Vital To Learn About An Acquisition Candidate."  *Management Focus*, (November/December 1981), 28-37 (winner of the annual Peat Marwick Authors Award).

**EXHBIT 31**
**PUBLISHING ACTIVITIES OF RONALD G. QUINTERO, CPA, CFA**

Mr. Quintero is also the author of numerous manuals and other publications that are used for professional training, covering topics that include, but are not limited to the following:

Accounting
Analyzing and valuing equities, fixed-income securities, stock options, warrants, derivatives, real estate, private equity, venture capital, alternative investments, intangible assets, and goodwill
Bankruptcy and Insolvency
Business Plans
Business Valuations
CFA Exam Preparation (Levels I, II, and III; most active trainer in the world)
Corporate Finance
Credit Risk
Credit Training
Due Diligence
Economics
Excel Applications
Fair Value Accounting and Valuation
Financial Projections and Forecasts
Financial Modeling
Financial Restructuring

Financial Statement Analysis
Financing a Business
Initial Public Offerings
Investment Banking
Leveraged Buyouts
Managing a Business
Managing High-Risk Clients
Mergers and Acquisitions
Negotiations
Private Banking
Private Equity
Professional Ethics
Quantitative Analysis
Quantitative Equity Analysis
Share-Based Consideration
Turnarounds and Workouts
Valuation Modeling
Valuations of Financial Instruments
Valuing Early-Stage Companies
Venture Capital
Workouts

**EXHBIT 31**
**PUBLISHING ACTIVITIES OF RONALD G. QUINTERO, CPA, CFA**

*Audicassettes*
"Broadcasting Mergers and Acquisitions" (Broadcast Financial Management Association, 1984)
"Turnarounds and Workouts" (American Institute of Certified Public Accountants, 1989)

*Videocassettes*
"Preparing for the CFA Exam: Level I" (New York Institute of Finance /MUCIA, 1999)
Ethics and Professional Standards
Financial Statement Analysis
Corporate Finance
Equity Securities
Alternative Investments

*Webinars and Podcasts* (2012 – 2015)
Business Combinations and Consolidations
Business Valuation in Commercial Litigation
CFA Level I Review
CFA Level II Review
CFA Level III Review
Due Diligence
Fair Value Accounting
Mergers & Acquisitions
Share-Based Accounting
Valuation for Financial Reporting

4