UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------X
MITCHELL H. KOSSOFF,

               Plaintiff,

    -against-

RICKY FELBERBAUM and FLORIDA FORECLOSURE
ATTORNEYS, PLLC,

              Defendants.
-------------------------------------------X

14 Civ. 1144 (RWS)

OPINION

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 2/19/17

A P P E A R A N C E S:

    Attorney for Plaintiff

    ESSNER & KOBIN, LLP
    50 Broadway
    New York, NY 10004
    By:  Howard Essner, Esq.

    Attorneys for Defendants

    EISEMAN LEVINE LEHRHAUPT & KAKOYIANNIS, P.C.
    805 Third Avenue, 10th Floor
    New York, NY 10022
    By:  Eric R. Levine, Esq.
         Eric Aschkenasy, Esq.

**Sweet, D.J.**

A bench trial in this action was held before the Court between June 5 and June 19, 2017. The evidence demonstrates the heavy risks that can ensue when the personal is mixed with the professional and how the fabrics of fellowship can fray by the need for cash, perhaps paradigmatic of our present society.

Based upon the prior proceedings, the findings of fact, and conclusions of law set forth below, Plaintiff Mitchell H. Kossoff ("Kossoff" or the "Plaintiff") has proven his claim for unjust enrichment by a preponderance of the evidence to offset his obligation to the Defendant Ricky Felberbaum ("Felberbaum"). The final judgment as between Plaintiff and Defendants Felberbaum and Florida Foreclosure Attorneys, PLLC ("FFA" and, together with Felberbaum, "Defendants") will be entered following additional submissions from the parties.

**Prior Proceedings**

Plaintiff filed his Complaint in New York State Supreme Court on January 28, 2014, alleging claims of breach of contract, unjust enrichment, accounting, fraud, and a declaratory judgment voiding a January 11, 2013 promissory note executed by Kossoff in favor of Felberbaum (the "Note"). (See Dkt. No. 2.) On February 24, 2014, Defendants removed the case to federal court under diversity jurisdiction.

On March 3, 2014, Defendants moved to dismiss Plaintiff's Complaint. (Dkt. No. 4.) On May 7, 2014, Defendants' motion was granted except as to Plaintiff's unjust enrichment claim. (Dkt. No. 14.) On May 21, 2014, Defendants filed a counterclaim against Plaintiff seeking recovery on the Note. (Dkt. No. 15.) Discovery proceeded.

On October 23, 2015, Defendants moved for summary judgment as to Plaintiff's remaining claim and Defendants' counterclaim. (Dkt. No. 41.) On April 5, 2016, Defendants' motion was granted with respect to Defendants' counterclaims, although without determining the issue of damages, and denied Defendants' motion with respect to Plaintiff's unjust enrichment claim. (Dkt. No. 57.) On May 5, 2016, Defendants' moved for partial summary

judgment as to the amount owed to Defendants by Plaintiff under the Note, (Dkt. No. 60), which was denied on September 12, 2016, (Dkt. No. 83). Defendants' motions *in limine* were heard in November 2016 and addressed by the Court on March 15, 2017. (Dkt. No. 106.)

Evidence was presented between June 5 and June 19, 2017. Final arguments and submissions were made on August 16, 2017, at which point the matter was marked fully submitted.

**Findings of Fact**

The witnesses over the course of ten days of testimony established that, as a witness, Kossoff was overly emotional, and those emotions often caused imprecision in his testimony. Kossoff periodically had to rephrase or amend prior statements made from before trial or even between days of testimony.[1] The language Kossoff employed in his Complaint, which ranged from the sloppy and hyperbolic to the incorrect, as demonstrated by

---

[1]    Colorful and evocative language littered Kossoff's testimony, such as describing himself as the "sheriff" of FFA who "wrangled all the outlaws" in the "Dodge City," (Tr. 260:22-23), or describing Felberbaum as "Pharaoh, when the Jews were trying to get out of Egypt," (Tr. 290:19-20).

3

testimony at trial, was troubling.[2] Nevertheless, Kossoff overall endeavored to be truthful and, underneath the occasional bluster, otherwise was truthful regarding his involvement with Felberbaum and FFA. Felberbaum, while also generally honest, was less of a details-oriented individual than Kossoff, and to the extent that his recollection of discrete events differed from Kossoff, Kossoff's account is generally believed.

## a. The Parties' Relationship and FFA's Beginnings

Kossoff and Felberbaum's relationship covered three decades, stating in the late 1980s in New York City when Kossoff first became Felberbaum's sponsor in Alcoholics Anonymous ("AA"). (Tr. 27:12-22, 302:1-14.[3]) Through the AA program and Felberbaum's recovery process, the two became close friends. (See Tr. 343:15-20, 440:14-17, 1065:8-1066:2, 1107:20-22.) The relationship was deep and sincere. As Felberbaum aptly stated, Kossoff "was the – still, single-most influential man in my life. He became closer to me than my family." (Tr. 1065:16-17.)

---

[2]   (See, e.g., Tr. 273:3-8, 320:19-23, 325:12-16, 338:22-339:12, 694:16-695:14.)

[3]   Citations to "Tr." refer to the transcript of the trial held in this matter from June 5 to June 19, 2017 and any exhibits referenced therein.

4

As part of putting his life back together, Felberbaum returned to Florida, where he had lived previously, and reestablished himself as a real estate lawyer, ultimately opening up a firm named Felberbaum & Associates; Kossoff remained in New York City, where he practiced law at his own law firm, then named Kossoff & Unger and, later, Kossoff, PLLC. (Tr. 28:1-23, 30:3-12, 31:9-11, 39:5-8; 655:9-15.)

In the years that followed, Kossoff provided assistance and advice to Felberbaum in both personal and professional capacities, including, *inter alia*, discussing job opportunities, navigating Felberbaum's personal bankruptcy, offering support while Felberbaum sought and acquired readmission to the Florida Bar, and providing a sounding board for personal concerns. (Tr. 28:17-29:19, 38:11-39, 324:10-325:4, 334:7-17, 361:12-363:23, 1065:19-1066:2, 1067:15-17, 1068:17-20, 1069:11-22.) In the years prior to 2010, Kossoff created invoices for Felberbaum for services rendered on only two occasions, of which only one was received and paid.[4] (Tr. 33:1-7, 344:10-18, 347:16-354:21,

---

[4] The first instance, in 2003, was when Kossoff assisted in smoothing over Felberbaum's relationship with a title company, Fidelity Title, which had accused Felberbaum of improper book-keeping; records indicate invoices for this matter were paid. (Tr. 30:13-32:17, 334:22-335:10, 346:10-347:15, 1070:16-1071:4.) The second instance, in 2008, was for Kossoff reviewing acquisition documents for Felberbaum with regard to Felberbaum's purchase of business from a company called the Golson Law Firm,

5

1070:16-1071:16; Defs.' Ex. R.) There is no documentary evidence during this time that Kossoff had a policy of keeping time records for his regular interactions with Felberbaum. (Tr. 352:3-5) Kossoff has not sought compensation for any services or assistance he provided Felberbaum or Felberbaum's businesses prior to the beginning of 2011. (Tr. 38:11-14, 306:2-8, 337:16-22.)

In October 2008, Felberbaum started a foreclosure business, Florida Foreclosure Attorneys, PLLC. (Tr. 1076:21-24.) While a part of FFA's initial business was derived from assets purchased from an existing foreclosure law firm, the Golson Law Firm ("Golson"), by mid-to-late 2010 Felberbaum became a Federal Home Loan Mortgage Corporation ("Freddie Mac") designated vendor, which increased the number of foreclosure files to which FAA had access. (Tr. 39:9-20, 48:21-49:4, 52:13-14, 53:14-22, 203:1-13, 963:19-964:17, 1077:16-1081:10, 1079:9-1081:4, 1204:21-1205:16.)

In late 2009, the Florida Bar filed a complaint against Felberbaum, alleging improper management of business-related escrow accounts. (Tr. 40:3-42:3, 1092:21-25.) The complaint

described below; records indicate this invoice was not paid and no record indicates the invoice was sent to Felberbaum. (Tr. 39:9-20, 335:16-336:9, 349:6-354:21, 1071:5-16.)

resulted in a Florida Bar grievance committee hearing in April 2011, for which Felberbaum had local Florida counsel; Kossoff provided assistance during the proceeding by reviewing relevant documents and, at Felberbaum's request, attending the hearing and answering questions to the committee in support of Felberbaum.[5] (Tr. 42:12-47:9, 1094:9-17, 1173:13-17.) By May 2011, the proceeding resolved, and Felberbaum admitted to a minor misconduct, which resulted in no impact on his foreclosure law practice. (Tr. 47:10-17, 49:11-21, 67:12-68:8, 70:11-71:11, 1093:1-23.)

During Kossoff's trip to Florida for Felberbaum's Florida Bar grievance committee hearing in April 2011, Kossoff and Felberbaum had a conversation in which Felberbaum asked Kossoff if Kossoff would be Felberbaum's partner with regard to FFA.[6] (Tr. 51:1-4, 402:5-7.) Kossoff's testimony has varied as to the

---

[5]   Kossoff stated that, prior to getting involved with Felberbaum's Florida Bar grievance issue, Kossoff informed Felberbaum that, because Felberbaum now had money to pay, Kossoff would expect compensation for his work. (Tr. 40:21-41:16.) Given that line items on Kossoff's timesheets are for pre-April 2011 work on Felberbaum's grievance claim, it is more likely than not that this conversation happened, and it helps explain the composition of the timesheets, discussed below.

[6]   Felberbaum denied this conversation happened. (Tr. 1101:16-22.) Based on Kossoff's subsequent work for and attitude towards FFA, Kossoff's account that the conversation actually happened is believed.

precise timing, phrasing, and location of the conversation, though the general timing of the conversation, in April 2011, location, Felberbaum's car, and thrust of the conversation, that Kossoff was invited to be involved with FFA's business, has been consistent. (See Tr. 50:12-51:4, 400:10-21, 401:12-402:7, 407:17-408:2.[7]) The consistency with which Kossoff has generally testified to the conversation, in combination with the manner in which Kossoff interacted with FFA during the subsequent years, described below, makes the existence of the conversation more likely than not. Since the grievance hearing took place on April 20, 2011, it is most likely the conversation took place around then. (See Defs.' Ex. II at 8.) At the time of this conversation, no specific details as to Kossoff's compensation as a partner were discussed. (See Tr. 410:10-20, 414:13-20, 431:21-433:18.)

---

[7]     Defendants note that Plaintiff's expert Ronald Quintero recounted another variation of this conversation as he heard it from Kossoff, which dated the conversation around January 2011, a date more in line with what Kossoff initially wrote in his Complaint. (See Tr. 833:1-834:16; Compl. ¶ 19.) Given the relevant consistency and greater logic of Kossoff's testimony during Kossoff's deposition and hours spent testifying at trial—particularly in regard to the discussion's focus and time period—that account is given greater weight and is credited.

8

During 2011 and 2012, Kossoff provided assistance to Felberbaum and FAA on differing aspects of FFA's business as, including:

- A lawsuit brought by Golson against Felberbaum over allegations of Felberbaum's noncompliance with the terms of the purchase agreement of Golson's company, during which Kossoff assisted in reviewing files, corresponding with Golson, and providing perspective to local Florida counsel as to terms of possible settlement. (See Tr. 55:20-56:22, 59:3-65:21, 1091:11-23, 1284:16-19.)

- Issues regarding unresolved title claims, and unpaid local Florida counsel's unpaid invoices claims involving FFA. (See Tr. 77:10-78:9, 83:12-58:13, 86:25-90:6, 94:6-97:8, 1329:22-1330:19.[8])

- Applying for lines of credit from different banks and acquiring a line of credit for FFA from Northern Trust and assisting Felberbaum in acquiring credit to finance FFA operations. (See Tr. 99:13-107:3, 112:1-128:13 1081:16-1083:24, 1285:10-1286:2.)

---

[8] Of note, in a February 2012 email sent in with regard to this matter, Felberbaum refers to Kossoff as his "business partner." (Pl.'s Ex. 209.)

9

- Locating, renting, subleasing, and acquiring insurance for additional Florida office space for FFA. (See Tr. 132:18-148:6, 1297:8-1298:13.)

- FFA employee hiring and drafting employee biographies for the FFA website. (See Tr. 159:13-179:24, 189:9-190:21, 195:3-196:24, 1090:18-24, 1310:5-14.)

- General business strategy advice, including with regard to potential litigation. (See Tr. 70:11-74:19, 97:25-99:20, 213:20-225:7, 239:9-241:6, 1320:11-1325:2.)

Kossoff averred at trial that he was heavily involved in the day-to-day operations of FFA, a dedication inspired by his established relationship as Felberbaum's partner and as evidenced by his appointed title of FFA's Executive Vice President.[9] (See Tr. 66:13-68:8, 153:12-154:11; Pl.'s Exs. 16A, 97, 106, 121.) As part of his involvement with Felberbaum and FFA, Kossoff traveled from New York to Florida approximately a

---

[9]    Kossoff testified that he used the title Executive Vice President "interchangeably for quite some time" while at FFA. (Tr. 703:22-23.) The title appears to have originally been given to assist Kossoff in securing business for FFA from Chase Bank. (See Tr. 960:10-20.) While it is believed that Kossoff received this title and did use it from time to time, that fact of the title itself is given little weight other than to signify that Kossoff was involved with FFA and that Felberbaum knew and approved of Kossoff's involvement. Similar weight and significance is given to the fact that Kossoff had his own FFA email address. (See Tr. 721:22-36.)

10

dozen to twenty times from 2011 through 2013, usually for a
couple of days at a time, and went to the FFA offices about half
the time.[10] (See Tr. 423:13-22, 955:11-16, 1102:8-1103:3.)

Between 2011 and 2013, FFA's revenue grew year over year,
rising from negative net income in 2011 to almost $2 million in
2013. (See Pl.'s Ex. 228; Tr. 255:14-261:1.)

### b. Kossoff's Timesheets

As part of Kossoff's firm's practice, he and his employees
kept track of the time each spent working on client matters.
(See Tr. 581:8-17, 583:7-9.) Time was billed on an hourly basis,
and Kossoff's time record billing program allowed users to
indicate for which client a particular task was being performed;
one such client was labelled as "Felberbaum.FFA." (See Tr.
526:8-527:11, 582:3-8, 583:1-6; see generally Defs.' Ex. II.)
Timesheets for Kossoff, PLLC input into the system as related to

---

[10]     During trial, Kossoff's estimates as to the number of
Florida trips varied across an enormous range. (See Tr. 183:20-
184:12 (stating he traveled to Florida two or three times a
month), 238:19-239:2 (stating he traveled to Florida twenty
times a year)). This range is evidence of Kossoff's propensity
to exaggerate, as noted above, but does not discredit the
existence of kernels of truth baked within—namely, that a number
of trips did take place involving FFA business, a fact
corroborated by Felberbaum. (Tr. 1102:12-1103:2.)

work performed for Defendants from January 2011 through March 2013, were entered into evidence.[11] (See Defs.' Ex. II.) Over that time period, the timesheets indicate that Kossoff billed 724.9 hours to Felberbaum or FFA for work performed. (See id., at 1.)

At trial, Kossoff testified that the timesheets presented were "partial [and] inaccurate" because he would only "occasionally" enter his time for work he did for Felberbaum or FFA. (Tr. 572:5, 597:22; see Tr. 718:13 ("It's a hodgepodge of time sheets that I chose to enter on.").) Kossoff instead testified that he worked for Defendants a minimum of 30 hours a week or more for 50 weeks in 2011 and 2012 and, in 2013, for 15 hours or more per week for 12 weeks, for a total of 3,180 hours. (See Tr. 280:6-282:20.)

In support of his claim of underreporting, Kossoff pointed to documentary evidence that reflected work he performed but that was not included in the timesheet, or timesheet entries by other members of Kossoff's firm that reference Kossoff but for

---

[11] A timesheet like Defendants' Exhibit II appears to have been sent to Felberbaum during Kossoff and Felberbaum's December 2012 message exchange, (see Defs.' Ex. D), although as discussed below, this document was unlikely to have been the one sent at that time.

which Kossoff has no corresponding entry. (See, e.g., Pl.'s Exs. 68, 86, 96, 131, 163, 204; Defs.' Ex. II, at 11.) In addition, Kossoff proffered testimony from his former law partner, Justice Sally Unger ("Unger"), who testified that she understood, from conversations and observations of Kossoff, along with a trip to Florida with him in May 2012, that Kossoff worked the hours and made the trips he claimed to have done for Defendants.[12] (See Tr. 494:6-11, 495:24-496:25, 500:23-502:6, 503:17-505:18, 1148:11-1149:15.) Another of Kossoff's employees, Joseph Goldsmith ("Goldsmith"), testified that Kossoff spent a large amount of time working on FFA matters, including reviewing files that were sent up from FFA offices to Kossoff.[13] (Tr. 1048:24-1056:1.)

---

[12]   Defendants note that Unger's impressions of the amount of work that Kossoff performed for Defendants was based exclusively on his representations to her, not on Unger actually overseeing or participating in what work Kossoff was doing. (See Tr. 513:4-18.) Unger's testimony does not itself establish how much work Kossoff was performing for Defendants, but she was a credible witness. While her estimation that Kossoff worked "easily over 30 hours a week," (Tr. 496:24), cannot be squared with the rest of the credible documentary and testimonial evidence, Unger's testimony and general impressions nevertheless provide weight to the proposition that Kossoff performed a non-trivial amount of work for Felberbaum and FFA.

[13]   Felberbaum and other FFA employees testified that no client files were ever sent to Kossoff up in New York because FFA operated with a paperless file storage system. (Tr. 961:10-18, 1146:8-22, 1205:6-1206:4.) Goldsmith's testimony was credible, however, so it is believed that some files, even if not client files, were sent from FFA up to Kossoff at various points.

13

Defendants presented contrasting evidence, principally from witness testimony, to demonstrate that Kossoff's timesheets inflated the hours he worked on matters for Felberbaum and FFA. In addition to Felberbaum, two other FFA employees, Jennifer Wersal ("Wersal"), FFA's Chief Compliance Officer, and Melody Maxwell ("Maxwell"), FFA's Director of Operations and Human Resources, testified that Kossoff's accounts of his heavy involvement in the daily affairs of FFA were not as they recalled them. Felberbaum testified that Kossoff was only marginally involved in FFA operations and was assisting as a friend and Felberbaum's sponsor. (Tr. 1089:7-1090:14, 1092:8-17.) Wersal testified that, as to her offer of employment at FFA, Kossoff had no role in her joining FFA.[14] (See Tr. 1198:12-24.) Maxwell testified that she had limited meetings with Kossoff over the years and did not speak to him on a daily basis; rather, she testified that she copied him from time to time on "some e-mails" and "a few text messages." (Tr. 957:2-958:23.) Both Wersal and Maxwell testified that while Kossoff would sometimes be at the FFA offices, he only occasionally sat in on meetings, was not reported to, did not regularly review

---

[14] An employment offer letter to Wersal was sent on January 10, 2012, and signed by Kossoff. (Pl.'s Ex. 89.) Of corroborating note, a timesheet entry was entered on that day by Kossoff for 1.5 hours with regard to preparation of an employment letter. (See Defs.' Ex. II, at 35.)

14

FFA files, and did not have his own office on the FFA premises. (See Tr. 960:2-9, 962:15-963:4, 974:17-19, 978:2-4, 1199:2-1200:1, 1202:5-10, 1220:12-14.)

Based on the totality of the evidence, Kossoff performed work for Felberbaum and FFA and Kossoff's timesheet entries are the only proven record of the time he worked. Kossoff repeated often, and believably, that he lived his life "in point tenths of an hour." (Tr. 677:14.) It is unreasonable to conclude that Kossoff would have entered contemporaneous, detailed, and time-precise entries completely detached from the reality of assignments on which he worked. It is much more likely that the time put into the timesheets over the years reflected work Kossoff actually performed.[15] This conclusion is buoyed by the fact that the many topics of work Kossoff identified doing are reflected, with reasonable time entries, in the timesheets. (E.g., compare Pl.'s Ex. 59 (emails with Northern Trust), and

_____

[15]    The fact that Kossoff testified, in the context of the timesheets, that he did not "intend to bill Mr. Felberbaum" for the time recorded does not detract from the reliability of the timesheets. (Tr. 677:11-22.) Kossoff, a "record keeper by nature," reasonably could have believed he would have received a percentage of FFA's profits but, nevertheless, have still entered time, either out of habit or to demonstrate to others at his firm what work he was doing during the day. (Tr. 305:23; see also Tr. 654:15-655:15 (indicating that Kossoff filled out timesheets because it "it mattered" to him whether his timesheets looked "anemic" or not).)

Pl.'s Ex. 116 (letter to Kossoff from real estate landlord

discussing sublease agreement), with Defs.' Ex. II, at 20

(Kossoff time entry for 1.2 hours from the day before Pl.'s Ex.

59 regarding reviewing "loan closing issues"), and Defs.' Ex.

II, at 45 (Kossoff time entry for 1.3 hours from two weeks

before Pl.'s Ex. 116 regarding discussions as to "lease and

other issues", and Defs.' Ex. II, at 45 (Kossoff time entry for

1.5 hours regarding review of "various bios" and "revisions

thereto"); see also Defs.' Post-Trial Submission of Proposed

Findings of Fact and Conclusions of Law ("Defs.' Mem.") at 78-

81.) Unger and Goldsmith's testimonies support this conclusion

to a lesser degree. See supra at 13.


While Kossoff presented testimony and evidentiary

submissions to argue that not every piece of work performed was

entered into the timesheets, the adduced facts have not

established how much more time was spent on those actions.

Kossoff's retrospective testimony with respect to numbers and

dates is not reliable.[16] In addition, the testimonial evidence of

---

[16]    For example, the wide range of numbers of trips Kossoff
claims he took to Florida over the years detracts from his
credibility as a fair assessor of time spent working. See supra
at 11 n.10. Kossoff's estimate of 3,180 hours over the years, a
figure divorced from the timesheets and unsupported by any
records of travel, is irreconcilable with other credible
testimony, and is not accepted. Together, Kossoff's testimony as
to numerical estimates are taken as unreliable.

Maxwell and Wersal, which indicated that Kossoff's testimonial representations of his efforts were at times aggrandized by Kossoff, who was prone to hyperbole, especially while riled, as occurred during trial. However, the timesheets, contemporaneously entered, are corroborated by documentary evidence, contain time entries of reasonable lengths for the described work, and are not incompatible with the testimony of those on the ground at FFA.

## c. The Assignment, its Dissolution, and the Note

The first time Kossoff and Felberbaum discussed Kossoff's compensation for work performed for FFA since the 2011 conversation was in April 2012. (Tr. 243:9-244:15.) Over a series of text messages, Kossoff indicated to Felberbaum that Kossoff wanted a "private writing . . . as between us what percentage interest of FFA [Felberbaum] would be willing to transfer over to [Kossoff] for [Kossoff's] past - present and continuing efforts", to which Felberbaum responded back, "Sounds good! I have no idea what percentage though". (Pl.'s Ex. 19 at 1-2.) Kossoff's desire for a written agreement was motivated, in part, by Kossoff's personal financial and familial concerns and, in part, by Kossoff's concern of what would happen if something should befall Felberbaum, who had recently had a heart attack;

17

after a limited negotiation between the two, during which Kossoff started at 33% and Felberbaum started at 10%, the discussion culminated in an Assignment of Membership Units Agreement (the "Assignment") that stated that Kossoff was assigned a 22% interest in FFA.[17] (See Tr. 244:16-254:11, 558:12-559:4, 692:17-693:11, 724:16-20, 1109:25-1110:12; Defs.' Ex. N; see also Pl.'s Exs. 19-20.) At the time of signing, Kossoff viewed the document as "not enforceable," but that it served as a representation of his "expectation" of eventual payment from his work with FFA. (Tr. 578:18-21; see also Tr. 254 (Kossoff stating that he had "achieved [his] goal, which was to have some sort of – was to have our amorphous agreement reduced to some sort of writing").) At no point during the existence of the Assignment was the agreement enforceable, as Kossoff was never admitted to practice law in Florida and FFA continued to owe settlement payments to Golson under terms of their settlement

---

[17]     Felberbaum depicts the Assignment as a perfunctory favor performed for Kossoff to prevent Kossoff's wife from bothering Kossoff about taking trips down to Florida. (See Tr. 1110:3-1111:18, 1128:25-1129:9.) Based on later messages from Felberbaum to Kossoff, it is accepted that Felberbaum signed the Assignment based on Kossoff's invocation of Kossoff's wife and a promise to keep the agreement quiet. (See Defs.' Exs. D & E; Tr. 1112:4-16.) Evidence from documents and testimony also reasonably support that, from Kossoff's perspective, the Assignment was based on marital concerns, financial worries, and his interest in possessing a document related to his involvement with FFA—the three are not mutually exclusive. (See Defs.' Ex. O.)

18

agreement, which barred any change in FFA ownership. (See Tr. 461:5-19, 463:15-464:2.)

During this period, Felberbaum had been loaning Kossoff money, both of a personal nature and in support of independent business ventures undertaken by Kossoff over the years. (Tr. 262:18-266:2; see Tr. 482:14-485:10, 1130:20-1131:15; Defs.' Ex. O.) As the loans accrued, the financial situation between the two reached a breaking point in December 2012, at which time Kossoff and Felberbaum's relationship deteriorated. (Tr. 478:9-11.)

On December 5, 2012, Felberbaum initiated a series of messages with Kossoff that requested Kossoff pay back some of the monies Felberbaum had loaned to him. (See Defs.' Ex. D.) Over the next several days, Felberbaum told Kossoff that, to organize his own finances, he needed from Kossoff a "typical promissory note" on the debt owned. (Defs.' Ex. E, at 6; see also Pl.'s Ex. 232.) In response, Kossoff indicated that he viewed the loans as hopefully "offset by distributions" amounts owed to him under his future 22% share of FFA profits and that he felt as though he was being cut out of the FFA picture. (Defs.' Ex. E, at 5.) While continuing to discuss the loaned monies, Felberbaum responded that he found "[t]he whole 22%

19

issue . . . very troubling" and that he "never really thought it was right to actually give you any equity position"; Felberbaum indicated he signed the Assignment because Kossoff had mentioned he needed it because of his wife, but that now Felberbaum did not "feel the 22% equity is right." (Id., at 4.) Kossoff then emailed Felberbaum billing records of time Kossoff stated he had spent on FFA work, which he claimed amounted to over $426,000 of work[18]; Felberbaum expressed surprise that "all of [Kossoff's] help which was always feely given is now at a cost" and that he had he "hit it big [Kossoff would] be part of it . . . but thats [sic] still so far off . . . ." (Id., at 3.)

Kossoff's subsequent emails to Felberbaum that day back-pedaled on his claim to FFA equity: Kossoff wrote that he was "sorry" and "did not mean to say at all that what I have given to you out of love had a price tag to it" because Felberbaum's "friendship mean more to me than a perecentage [sic] ownership in FFA." (Id., at 2.) After Felberbaum expressed additional concern at the thought that Kossoff would not be paying him back because of "offsetting from legal fees," he noted that he had

<hr>

[18]    It is unclear what document exactly was sent to Felberbaum to reach this figure, since timesheets admitted into evidence included entries through March 2013, after the date of these emails. (See Tr. 585:1-22.) At minimum, Kossoff indicated that his billed hourly rate at that time was $450 an hour. (See Tr. 591:14-15, 594:9-565:8.)

"chest pains." (Id., at 1.) Kossoff wrote that "it was not my intention to offset legal fees from the monies owned to you but merely to show you how much effort I was putting into FFA." (Id.) Kossoff finished by stating he would prepare and execute a note for Felberbaum. (See id.) Kossoff testified that he perceived this as a "fight" or "minor altercation between lifelong friends" but did not think Felberbaum would ultimately not pay him for work performed for FFA, although this was a dispute about finances. (Tr. 559:25-560:7; see also 570:10-20; Defs.' Ex. E, at 1 ("[W]ell even brothers fight sometimes . . . .").) The reconciliatory tone at the conclusion of the messages was, in part, driven by Kossoff's fear of Felberbaum having another heart attack.[19] (See Tr. 567:21-24, 570:17-20, 1315:15-16.)

On January 11, 2013, Kossoff signed an agreement with Felberbaum that stated that certain monies from Felberbaum to Kossoff were to be treated as loans, not investments, and became

---

[19] Defendants make much of Kossoff's messages in Defendants' Exhibit E, specifically the line: "I am so sorry. I did not mean to say at all that what I had given to you out of love had a price tag to it because it did not." (See Tr. 732:13-16.) However, Kossoff and Felberbaum did—and perhaps still do—care deeply for one another, and given Felberbaum's prior health issues and the tone of Felberbaum's emails demonstrating his stress and anger, described above, it is entirely believable that Kossoff moderated his position in an attempt to calm his friend down.

the Note. (Defs.' Exs. A, G; see Tr. 536:13-25.) The outstanding principal payment on the Note, which has been acknowledged by both parties, is $515,000.[20] (Declaration of Howard Essner dated October 26, 2016, ¶ 3, Dkt. No. 98.) As relevant to the instant claims, the Note contained the following term:

> In the event that this Note is referred to an attorney for collection because of a default, the Borrower shall also be liable for a sum equal to all collection costs and expenses, including an attorney's fee equal to five percent of the amount owing on account of this Note at the time of such reference.

(Defs.' Ex. A ¶ 2.)

Friction between the two friends continued into 2013, although initially Kossoff still viewed himself as a part of the FFA team. (See Tr. 580:19-24.) Financial discontent culminated on March 18, 2013, when Felberbaum initiated a series of messages to Kossoff expressing his desire that Kossoff renounce the Assignment to clarify ownership of his "estate in the future." (Pl.'s Ex. 233, at 3; see Tr. 269:17-19, 270:23-271:14, 726:9-727:1.) As a substitute, Felberbaum suggested the two "do a note payable in the event of future revenues or something like

---

[20] Defendants note that Plaintiff's Complaint was filed three days before the balance of the Note was due; Kossoff contends that he hoped that matters could be worked out with Felberbaum prior to litigation. (See Tr. 288:11-289:5.) The timing no doubt played a role in the instant litigation, but has no bearing on resolution of the instant matter.

that." (Pl.'s Ex. 233, at 3.) The two emailed back-and-forth, with Kossoff stating that he wanted still to "participate in future profits generated by FFA" and Felberbaum viewing the 22% Assignment as "ridiculous under any scenario." (Id., at 2.) Kossoff, perceiving the messages as "questioning [his] participation in FFA," proceeded to list a number of "matters' which "need[ed] to be attended to immediately," including reviewing loan documents, escrow funds, malpractice insurance, and title claim litigation.[21] (Id., at 1.) Felberbaum concluded by stating that he was "not questioning anything" but that he could "handle these things if [Kossoff] [did not] want to any longer." (Id.)

Following this exchange, Kossoff stopped performing work for FFA and viewed Felberbaum as "termininat[ing]" their relationship. (Tr. 726:9-10; see Tr. 464:2) On April 6, 2013, Kossoff renounced the Assignment in a written document. (Tr. 273:14-274:7; Pl.'s Ex. 22.)

---

[21]   Felberbaum testified that the resolution of these tasks took minimal amounts of time. (See Tr. 1138:15-1143:7.)

23

d. Expert Testimony

At trial, Plaintiff put forward an expert, Ronald Quintero ("Quintero") with respect to the value of Kossoff's services to FFA. Quintero is a certified public account, financial advisor, and management consultant at Chartered Capital Advisors. (Tr. 734:24-735:2.) Using the lodestar method, Quintero first took the hours he was told by Kossoff and Kossoff's counsel that Kossoff worked—3,180 hours between 2011 and 2013—and multiplied it by an hourly rate of $692.77, which Quintero determined was fair and reasonable by looking at rates billed by four large turnaround firms in Florida during the same time period. (Tr. 759:4-11, 759:3-760:6, 763:24-764:4, 792:7-21.) Accordingly, Quintero concluded that the value of Kossoff's services to Felberbaum and FFA was $2,203,009. (Tr. 764:3-4.)

Quintero's conclusions are given no weight because the hours and rate figures he employed are unsupported. First, as to the hours of work Kossoff performed for Felberbaum and FFA, they have been established only to what is detailed in the timesheets. As such, the number of hours Quintero used in his calculations is substantially higher than what has been proven. Second, as to the applicable rate, Quintero's calculations are based on the rate charged by well-known companies that even

Quintero stated FFA would have been unlikely to hire; Kossoff,

by contrast, has no turnaround experience or established

reputation in the turnaround field. (See Tr. 370:7-371:8,

867:25-868:8, 872:25-873:4, 892:22-24.) No basis has been

presented to conclude that Kossoff would be able to charge

comparable rates to firms like AlixPartners or FTI Consulting.

**Conclusions of Law**

Plaintiff has a single surviving claim against Defendants

for unjust enrichment. Under both Florida and New York law, a

claim of unjust enrichment requires that "(1) that the defendant

benefitted; (2) at the plaintiff's expense; and (3) that equity

and good conscience require restitution." Kaye v. Grossman, 202

F.3d 611, 616 (2d Cir. 2000); see also Belcastro v. Burberry

Ltd., No. 16 Civ. 1080 (VEC), 2017 WL 744596, at *7 (S.D.N.Y.

Feb. 23, 2017) (noting the similarity of New York and Florida

law as to unjust enrichment).[22] A plaintiff must show that

---

[22]    While under a claim of unjust enrichment, the issue is
whether "equity and good conscience require restitution," and
under *quantum meruit*, the issue is whether there is an
"expectation of compensation," the two are used interchangeably
and the "the analysis is substantially the same." In re Coudert
Bros., 487 B.R. 375, 398 & n.14 (S.D.N.Y. 2013) (citing Mid-
Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.,
418 F.3d 168, 175 (2d Cir. 2005)).

25

"services were performed <u>for the defendant</u> resulting in [the latter's] unjust enrichment, and the mere fact that the plaintiff's activities bestowed a benefit on the defendant is insufficient to establish a cause of action for unjust enrichment." <u>Clark v. Daby</u>, 300 A.D.2d 732, 732, 751 N.Y.S.2d 622, 623 (3d Dep't 2002) (alternation and emphasis in original) (internal citations omitted); <u>see also</u> <u>Bradkin v. Leverton</u>, 26 N.Y.2d 192, 309 N.Y.S.2d 192, 195 (1970) (noting that an unjust enrichment claim is created "regardless of the intention of the parties, to assure a just and equitable result") (citations omitted). "[A] party may not expect compensation for a benefit conferred gratuitously upon another." <u>Umscheid v. Simnacher</u>, 106 A.D.2d 380, 382, 482 N.Y.S.2d 295, 298 (2d Dep't 1984) (quotation marks omitted) (citing <u>Trott v. Dean Witter & Co.</u>, 438 F. Supp. 842, 844 (S.D.N.Y. 1977)). "Generally, courts will look to see if a benefit has been conferred on the defendant under mistake of fact or law, if the benefit still remains with the defendant, if there has been otherwise a change of position by the defendant, and whether the defendant's conduct was tortious or fraudulent." <u>Id.</u> (citation omitted). The measure of damages for an unjust enrichment claim is restricted to the "reasonable value of the services rendered by the plaintiff." <u>Giordano v. Thomson</u>, 564 F.3d 163, 170 (2d Cir. 2009) (citation omitted); <u>see also</u> <u>Keaney v. E. Computer Exch., Inc.</u>, No. 03

Civ. 1893 (RNC), 2007 WL 2298260, at *5 (D. Conn. Aug. 8, 2007) (citation omitted) ("In employment cases, the measure of damages typically used is the reasonable value of the services provided.").

The facts established at trial demonstrate that, for a portion of the time for which Kossoff seeks relief, Kossoff performed work for FAA with a reasonable expectation of compensation and for which equity requires restitution. Around the April 20 Florida trip, Kossoff and Felberbaum had a conversation during which Felberbaum indicated that he wanted Kossoff to be a partner in his FFA venture; whether Felberbaum intended this or not, it was reasonable for Kossoff to have believed that his efforts in providing work to FFA would result in compensation from the company.[23] This reasonable perception was strengthened when, in April 2012, after a year of work with FFA, Kossoff requested from Felberbaum a written verification of

---

[23] Kossoff's discussion with Felberbaum as to anticipating compensation for Kossoff's assistance with Felberbaum's Florida Bar grievance matter does not start Kossoff's reasonable expectation of compensation at that point. Assisting Felberbaum individually would have been the sort of service in Felberbaum's life that Kossoff had historically, with limited exception, performed gratuitously. However, the discussion in April 2011 is different, and the novel idea raised of a partnership relationship with regard to a distinct entity, FFA, renders Kossoff's expectation reasonable, even in light of their long-lasting friendship.

a percentage share of interest in FFA based, in part, on work provided so far, a request to which Felberbaum appears neither surprised nor resistant. Even despite the December 2012 dispute, it was reasonable for Kossoff to continue to believe he would be paid for his services until the dissolution of the relationship between Kossoff and Felberbaum in March 2013.

The actions Kossoff has established through the timesheets enriched FFA. Defendants argue that Kossoff never provided a client to FFA. Even so, the matters in which Kossoff did provide service—items like locating additional office space for FFA, assisting in securing a line of credit, providing opinions as to litigation claims against FFA, or interfacing with new FFA employee hires—each benefited FFA, and the benefits stayed with FFA: the space was occupied, the employees contributed, the credit was used. FFA benefited from Kossoff's until-now unpaid labor, and good conscious requires that Kossoff be compensated. See Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC, 813 F. Supp. 2d 489, 534 (S.D.N.Y. 2011) (citing Blue Cross of Cent. N.Y., Inc. v. Wheeler, 93 A.D.2d 995, 996, 461 N.Y.S.2d 624, 626 (4th Dep't 1983)) (holding that unjust enrichment applies when a defendant receives a benefit such as being saved [an] expense or loss" at the expense of another). FFA gained the benefit of Kossoff's hours of labor, and the value of that

28

effort is reasonably calculated: the time Kossoff spent on these different initiatives, as indicated by the timesheets, were they billed at the regular rate that Kossoff billed his clients during that time period, a rate of $450 an hour. See id. (stating that "the correct measure of Defendants' unjust enrichment is the value that Defendants would have paid had the parties negotiated"); Manhattan Telecomms. Corp. v. Glob. NAPS, Inc., No. 08 Civ. 3829 (JSR), 2010 WL 1326095, at *4 (S.D.N.Y. Mar. 31, 2010) (determining that "a fairer measure" of damages for an unjust enrichment claim would be the "the services provided [by plaintiff] as measured by the [applicable] rate"); Carlino v. Kaplan, 139 F. Supp. 2d 563, 565 (S.D.N.Y. 2001) (citation omitted) ("For the most part, compensation under *quantum meruit* is based on an hourly rate for the amount of time services that are rendered.").

Defendants contend that Kossoff had been performing services for Felberbaum for many years prior to 2011 in his capacity as Felberbaum's closest friend. Pointing to those prior actions, for which Kossoff does not seek restitution, Defendants argue that Kossoff's actions during 2011 through 2013 are no different and, accordingly, Kossoff could have no reasonable expectation for compensation during that time.

By way of comparison, Defendants rely principally on Umscheid v. Simnacher, 106 A.D.2d 380, 482 N.Y.S.2d 295 (1984). There, the New York Appellate Division affirmed a trial court's rejection of a *quantum meruit* claim brought by a petitioner for housekeeping and nursing services rendered to a respondent. Id. at 382. The court found that the fact that petitioner was respondent's "closest friend" supported the conclusion that the services were "rendered out of affection and without an expectation of compensation." Id. at 383. The court also found it "significant" that there was no "proof in the record that a bill for services rendered was ever presented to the respondent." Id.

Differences between Umscheid and the instant facts, and between Kossoff's years of earlier services for Felberbaum and Kossoff's work for FFA, support Kossoff's claim for unjust enrichment. Here, unlike in Umscheid, Kossoff's timesheets are records of his time spent performing work for FFA, and a version of them was provided to Felberbaum when it appeared that their business relationship might come to an end; while not a finalized bill of services, the ongoing nature of Kossoff's timesheet entries is significant. The presence of the timesheets in the context of his work for FFA is also significant because it is distinct from the previous decades of friendship in which

Kossoff, with only one clear exception, never provided a bill of any sort or sought to charge Felberbaum for anything. While Kossoff may not have believed he was to be paid strictly on the hours he worked, (see Tr. 677:11-22[24]), the continuous and contemporaneous recordkeeping by Kossoff during the time he provided services to FFA supports the proposition that his services were not "gratuitously rendered" and counters the notion "that an implied contract was an afterthought." Id. Equity, not Kossoff's perception of what he actually entitled to, dictates what the "fairer measure" of recovery ought to be. Manhattan Telecomms. Corp., 2010 WL 1326095, at *4 (rejecting both parties' submissions as to the "reasonable value of benefit conferred").

Kossoff has only proven his unjust enrichment claim within particular parameters. He has established a reasonable expectation of payment for work he performed for FFA following

---

[24] Given the context, Kossoff's emails to Felberbaum in late 2012, in which Kossoff writes that Felberbaum should not take Kossoff's emails to "mean to say at all that what [Kossoff] have given to [Felberbaum] out of love had a price tag to it," along with other statements expressing how important Felberbaum's friendship was to Kossoff, (Tr. 565:17-21), are better understood not as admissions that Kossoff did not expect compensation for his work at FFA, but in an attempt to calm Felberbaum down because Kossoff did not "want [Felberbaum] upset" and end a meaningful friendship and potentially profitable business arrangement, (Tr. 567:7).

the April 20, 2011 conversation with Felberbaum until the email
exchanges between the parties that occurred on March 18, 2013.
Any time spent prior to April or working on matters that
exclusively benefited Felberbaum, such as Felberbaum's Florida
Bar grievance matter, as opposed to directly assisting FFA, have
not been established as a break from the parties' previous
friendship, and good conscious does not require restitution. The
amount of work performed by Kossoff is as recorded in Kossoff's
timesheets, to be billed at a rate equal to the rate that
Kossoff established he would have normally and reasonably billed
his time to a client during those years, namely $450 an hour.[25]

Defendants advance two additional arguments against
Kossoff's unjust enrichment claim. First, they contend that
public policy prevents Kossoff from compensation for services
rendered to a Florida law firm while not a member of the Florida
Bar. See Fla. Stat. Ann. § 454.23. Second, Defendants contend
that the doctrine of unclean hands bars Kossoff from an
equitable remedy. Both arguments are unavailing.

---

[25]   Defendants argue that Kossoff has failed to establish for
which Defendant the services Kossoff rendered benefited, and
therefore his unjust enrichment claim must fail. However, as
discussed above, the reasonable expectation of compensation has
only been established for work done for FFA.

Under Florida law, it is illegal to practice law without a license, and courts have found it proper under public policy to prevent wrongdoers from benefiting from such actions. See Vista Designs, Inc. v. Silverman, 774 So. 2d 884, 888 (Fla. Dist. Ct. App. 2001) (finding work void under public policy because attorney that client did not know was unlicensed in Florida drafted pleadings, consulted with clients, took depositions, and lodged evidentiary objections at trial, which were "actions . . . beyond mere legal support or consulting"). There are exceptions to this rule, however. For example, in Florida, it is permitted for "a lawyer admitted in another state to provide legal services on a temporary basis in Florida if the services are undertaken in association with a lawyer admitted to practice in Florida." Morrison v. West, 30 So. 3d 561, 567 (Fla. Dist. Ct. App. 2010). In addition, an attorney may have "discussion[s] of, and advice upon, legal matters, preparation and review of legal documents, and any other act which may constitute the practice of law, so long as such activities merely constitute assistance to a member of The Florida Bar and, if the result of such activities is utilized, it is the product of, or is merged into the product of, a member of The Florida Bar for which the Florida Bar member takes professional responsibility." The Florida Bar v. Savitt, 363 So. 2d 559, 560 (Fla. 1978).

Restitution for Kossoff's work for FFA is not barred by public policy because the work Kossoff performed for FFA falls outside its impermissible scope. While Kossoff used his legal experience while reviewing documents, providing perspectives, and drafting letters and documents, his contributions were in conjunction with efforts performed by licensed local Florida counsel, including, often, Felberbaum himself. As such, Kossoff's work periodically reviewing documents and providing advice amounts to the kind of "mere legal support or consulting" outside the protective boundaries of public policy. Vista Design, Inc., 774 So. 2d at 888. Other services that Kossoff rendered, such as applying for lines of credit, assisting with FFA employment decisions, or locating new office rental space, do not amount to the types of professional actions that constitute the practice of law. Lastly, at no point did Defendants, or anybody, seem confused or mislead about whether Kossoff was licensed to practice law in Florida. Chandris, S.A. v. Yanakakis, 668 So. 2d 180, 184 (Fla. 1995) ("In determining whether a particular act constitutes the practice of law, our primary goal is the protection of the public.").

Defendants also contend that the equitable doctrine of unclean hands should preclude any recovery for Plaintiff. The doctrine of unclean hands "closes the doors of a court of equity

to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant." Motorola Credit Corp. v. Uzan, 561 F.3d 123, 129 (2d Cir. 2009) (quoting Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co., 324 U.S. 806, 814 (1945)). Unclean hands is a narrow doctrine and "applies only where the misconduct alleged as the basis for the defense 'has immediate and necessary relation to the equity that [plaintiff] seeks in respect of the matter in litigation.'" Specialty Minerals, Inc. v. Pluess-Staufer AG, 395 F. Supp. 2d 109, 112 (S.D.N.Y. 2005) (quoting Keystone Driller Co. v. Gen. Excavator Co., 290 U.S. 240, 245 (1933)). "Typically, courts that have denied injunctive relief due to plaintiff's unclean hands have found plaintiff guilty of truly unconscionable and brazen behavior." Gidatex, S.r.L. v. Campaniello Imports, Ltd., 82 F. Supp. 2d 126, 131 (S.D.N.Y. 1999) (collecting cases). "Application of the 'unclean hands' doctrine rests with the discretion of the court, which is 'not bound by formula or restrained by any limitation that tends to trammel the free and just exercise of discretion.'" Aris-Isotoner Gloves, Inc. v. Berkshire Fashions, Inc., 792 F. Supp. 969, 969-70 (S.D.N.Y. 1992) (quoting Keystone Driller Co., 290 U.S. at 245).

35

Kossoff's actions do not rise to the level of the "truly unconscionable" to warrant preclusion. Defendants argue that Kossoff deceived Felberbaum into signing the Assignment and then deceptively sought to enforce it, even while Kossoff recognized it as a not legally-binding contract. Kossoff's decision to try to enforce the Assignment under a breach of contract claim, while legally quixotic, is not deceitful. Moreover, any confusion between the parties as to the signing of the Assignment is, at its base, about a contract that was at no point enforceable, and it is hard to imagine how the creation of such a document "has tainted this proceeding." Goldstein v. Delgratia Min. Co., 176 F.R.D. 454, 458 (S.D.N.Y. 1997) (dismissing an action for unclean hands after plaintiff made repeated and easily disprovable statements of fact and law to the court, exhibiting "blatant bare faced violence to the facts"). Defendants also point to Kossoff's inconsistent testimony throughout the trial. While it is undisputable that Kossoff's testimony has at times varied, particularly with regard to specific dates and figures, his testimony overall was not "so sull[ied] with untruths, misrepresentations and brazen failure to deal with the facts" that a finding of unclean hands is necessary to "protect the integrity of this Court." Id.

**Conclusion**

Based on the findings of fact and conclusions of law set forth above, Plaintiff has proven by the preponderance of the evidence entitlement to restitution for services rendered to FFA under a theory of unjust enrichment. As found previously by the Court, Defendants are entitled to payment by Plaintiff on the unpaid portion of the Note and any additional costs in accordance with its terms.

Submit judgment on notice.

It is so ordered.

**New York, NY**
**December / 8, 2017**

ROBERT W. SWEET
**U.S.D.J.**